IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| Ginger King,<br>ex rel United States of America and the State<br>of Texas, Relators, | CIVIL ACTION NO. 3:21-CV-1923 |
| V. | QUI TAM COMPLAINT PURSUANT TO<br>THE FALSE CLAIMS ACT, 31 U.S.C. §3729<br>ET SEQ. |
| Methodist Hospital of Dallas, d/b/a Methodist<br>Healthcare Systems and d/b/a Methodist<br>Dallas Medical Center,<br>Defendant | FILED UNDER SEAL |

## SECOND AMENDED QUI TAM COMPLAINT

Relator and Relator herein, Ginger King (Relator), hereby files this Second Amended Qui

Tam Complaint (SAC). As required, Relator has provided Disclosure Statements[1] as required by

§3730(e)(4)(B) and § 3730(b)(2) of the Federal False Claims Act (FCA) and the relevant

provisions of Texas Medicaid Fraud Prevention Act (TMFPA), within the Texas Human

Resources Code, consisting of all of the information known to her on which this action is based,

including all material evidence and information she possesses as required by § 3730(b)(2). The

purpose of this SAC is to (i) address supplemental disclosure information provided by Relator to

the Government since the filing of the original Complaint, (ii) clarify that the Government

through CMS has consistently taken enforcement action to assess penalties under the Hospital

Acquired Conditions Reduction Program (HACRP) and (iii) demonstrate that the HACRP and

the manner in which hospital acquired conditions (HAC) are identified and reported are based on

authoritative guidance. The footnotes contained herein, at the foot of this SAC, should be read

and considered as part of the allegations set forth in such paragraph.

SECOND AMENDED QUI TAM COMPLAINT – Page 1

## I. Summary of Claim

1. The Methodist Hospitals of Dallas (MHD) d/b/a Methodist Dallas Medical Center (MDMC) and also d/b/a as Methodist Health System (MHS) is located in North Texas and provides in-patient and outpatient medical care. MDMC is also the main teaching and referral center for MHS.

2. Relator believes, based on her observations and personal knowledge, that the practices described herein are occurring system wide at MHS and have been ongoing for several years. MHD, MDMC and MHS are collectively referred to herein as Defendant.

3. In hospitals and other health care facilities, health care-associated infections, i.e., "health care acquired infections" (HAIs), have become a serious concern from each of quality of care, safety and cost standpoints. HAIs are infections that people acquire while they are receiving treatment for medical or surgical conditions in a health care setting. HAIs can be acquired anywhere health care is delivered.

4. HAIs acquired in a hospital are among the leading causes of death in the United States. At any given time, about one in every 20 hospitalized patients has an HAI, while over one million HAIs occur across in health care facilities every year.

5. Hospital acquired HAIs alone are responsible for $28 billion to $33 billion in potentially preventable health care expenditures annually. Scientific evidence has shown that certain types of HAIs can be drastically reduced to save lives and avoid excess costs with proper care and attention. [2]

6. The Hospital Acquired Conditions (HAC) Reduction Program (HACRP) is a Medicare "pay-for-performance" program that supports the Centers for Medicare and Medicaid Services' (CMS') long-standing effort to link Medicare payments to healthcare quality in the

SECOND AMENDED QUI TAM COMPLAINT – Page 2

inpatient hospital setting. Section 1886(p) of the Social Security Act established the statutory requirements for the HAC Reduction Program.

7.      Beginning with Fiscal Year (FY) 2015 patient discharges (i.e., effective October 1, 2014), the HAC Reduction Program requires the Secretary of Health and Human Services (HHS) to adjust payments to hospitals that rank in the worst-performing 25 percent (bottom quartile) of all subsection (d)[3] hospitals with respect to HAC quality measures. At the same time, the higher performing hospitals in (top quartile) can be eligible for "incentive" payments.

8.      Hospitals with a Total HAC Score greater than the 75th percentile of all Total HAC Scores (*i.e., the hospitals that are in the worst-performing quartile*) will be subject to a 1 percent payment reduction in Medicare reimbursements. This payment adjustment applies to all Medicare patient discharges based on the fiscal year (FY) between October 1st and September 30th (i.e., FY). The payment reduction occurs as an offset when CMS pays hospital claims.

9.      In violation of the FCA[4] and TMFPA, Defendant has knowingly made, or caused to be made, *false claims* relating to its obligations under the HACRP that are material to the federal Medicare programs and Texas Medicaid program as follows below in paragraphs 10, 11 and 12:

10.     Falsely certifying, both expressly and impliedly, to accurately reporting and disclosing HACs as required by the HACRP through the CMS Hospital Quality Reporting (HQR) System in order to avoid being in the worst-performing 25 percent (bottom quartile) of all subsection (d) hospitals with respect to HAC quality measures.

11.     Falsely certifying, both expressly and impliedly, to accurately reporting and disclosing HACs pursuant the HACRP established by CMS in order to earn incentives under the HACRP for performance exceeding baseline target goals established under the HACRP.

SECOND AMENDED QUI TAM COMPLAINT – Page 3

12.     Submitting claims for reimbursement for services, including, inter alia, nursing services necessary for the delivery of proper care, were in fact non-existent, grossly deficient, materially substandard and/or worthless. Defendant knowingly exploited inpatients by receiving federal funds intended for *the care* of the patients while knowingly failing to utilize those funds toward patient *care. This has* caused infliction of physical pain, injury and/or mental anguish to the patients and the deprivation of services which are necessary to maintain the mental and physical health of its patients.

13.     If Defendant had properly accounted for and reported HAPIs in the HACRP HQR System, Defendant's Total HAC Score would have placed Defendant in the lowest quartile of all reporting hospitals, subjecting it to a one per cent (1%) reduction in Medicare reimbursement payments since the inception of the program in 2015.

## II.     The Parties

### A.     Relator Ginger King

14.     Relator Ginger King is a nursing professional with more than 19 years of clinical/leadership experience. From May 2019 until August 2020, Relator served as Acute Care Services Director for Cardiology, Centralized Monitor Bank, Oncology, Med-Surg., Wound Care and Interim Director of Education for MHS from February 2020 until August 2020.

15.     Beginning in mid-2019, Relator noted the increased number of HAPIs occurring at MDMC, including primarily if not exclusively the intensive care unit ("ICU") within MDMC to which the wound care department provided consultative services, and made the director of the ICU, Amy Mabry, and MDMC's Chief Nursing Officer, Barbara Madden, aware of the problem. From research conducted by Relator, nurses in the ICU were not, as required by Center protocol and law, turning patients regularly, and in some cases, also not even providing patients nutrition

SECOND AMENDED QUI TAM COMPLAINT – Page 4

required by Center protocol and law on the appropriate schedule. Also, Relator became aware that some patients were being dropped by nurses onto the floor, intentionally or negligently or grossly negligently.

16.    All incidents of HAPIs within MDMC were reported by Relator to Madden, Sherri Floyd, MDMC's risk manager, and Linda Scribner, MDMC's quality director.   Some of the severe, but not all of the, incidents of HAPIs within MDMC, failure to provide required nutrition, and falls, were required to be reported by Defendant or MDMC to the State of Texas (on information and belief by Scribner) through its Texas Department of State Health Services, but they were not timely reported.  Some of the severe, but not all of the, incidents of HAPIs within MDMC, failure to provide required nutrition, and falls, were required to be reported by Defendant or MDMC (on information and belief by Scribner) to the federal Center for Medicare Services as a result of the high percentage of patients at MDMC covered by Medicare. Some of the patients at MDMC were also covered by Medicaid. On information and belief, the total of Medicare and Medicaid patients served by MDMC approximates 80%, as opposed to self-paid patients or patients covered by private insurance.

17.    Between October 2019 and July 2020, the number of HAPIs associated with the ICU at MDMC grew to 64 after having been only at 18 total in 2018.

18.    In January 2020, Relator was nominated and received an award for nursing excellence, and in April 2020, received another award for nursing excellence, in both cases after nomination by other nurses at MDMC. On information and belief, nomination of Relator for the awards was approved by Madden, Mabry and Gessling.

19.    Beginning in January 2020, because of an increase in HAPIs from 2 in November 2019, to 9 in December 2019 and 15 in January 2020 to as many as 120 the entirety of 2020 prior

to July 31, 2020, Relator communicated regularly concerning the HAPIs and how to remedy them with Mabry, Madden, Sherri Floyd, MDMC's risk manager and Linda Scribner, MDMC's safety director, but she was not able to obtain from them agreements to assure appropriate minimization of the HAPIS at MDMC, which involved teaching nurses to comply with approved protocols to avoid HAPIs, confirming adherence to those protocols and otherwise being attentive as necessary to the avoidance of HAPIs.

20.     The failure of nurses in the ICU to follow turning protocols to avoid HAPIs in the ICU in particular accelerated beginning in March 2020. Also, Relator became aware of nurses in the ICU noting the fact that there were not family members of patients suffering HAPIs who could find out about their loved ones suffering HAPIs, investigate whether the HAPIs revealed negligence or gross negligence by one or more representatives of Defendant, and sue Defendant. On information and belief, Defendant and MDMC have not informed those entitled to sue on behalf of patients at MDMC, including patients themselves, for unnecessary HAPIs, falls and lack of nutrition.

21.     In April and May 2020, because of the failure of appropriate personnel to minimize ongoing HAPIs at MDMC, particularly in the ICU, Relator began to escalate the issue of HAPIs and resulting harm to patients to Mabry, Madden, Floyd, Scribner, and Pam Gessling, another director of nursing at MDMC for women's (obstetrical) services.

22.     Prior to July 23, 2020, in May 2020, Mabry criticized Relator for a patient telemetry issue unrelated to HAPIs and subjected her to false accusations in regard to that issue.

23.     On May 18, 2020, Madden commended Relator's performance as a whole, actually stating that it was so excellent that it made peers feel inadequate.

SECOND AMENDED QUI TAM COMPLAINT – Page 6

24.    Prior to July 23, 2020, based on the disclosures referred to in paragraphs 10 and 12, Relator reported to Defendant's supervisor, an administrator of the facility, Madden, violation of the public health provisions chapter, Chapter 161, of the Texas Health & Safety Code, a rule adopted under Chapter 161 of the Texas Health & Safety Code, or a rule of another agency other than a state regulatory agency, or otherwise engaged in protected conduct under Chapter 161.

25.    On July 23, 2020, Relator was subjected to adverse employment action by Mabry and Madden in the form of a purported final warning with regard to performance based on the false accusations against Relator related to the patient telemetry issue, an invitation to an assistant director of nursing to attend a meeting with her, interviewing a candidate for a nurse educator position and affording that candidate a position at MDMC at the direction of the Madden despite Gessling's opposition. Without her having received any prior warning, Relator responded that she believed the warning was not appropriate because of lack of merit to the stated grounds and also responded that she believed the warning was a retaliatory response to her continuing complaints of the need to reduce HAPIs, especially in the ICU, which had been reinforced by a report of HAPIs that same week to non-governmental entities by subordinates of Relator and by records of HAPIs provided by Relator to Madden and Mabry and Lavelver Marks, human resources director of MDMC. On July 24, 2020, Madden told Relator, in a meeting Marks, that she was allegedly sabotaging Mabry and that Mabry and Madden wished to relieve her from her position and that she should resign or be terminated because she would not be successful and would no longer be a good fit for the senior director nursing team. On a date prior to July 27, 2020, Mabry told Relator to stay in her lane. On July 27, 2020, Mabry again told Relator to stay in her lane. On other dates prior to July 31, 2020, Relator was subjected to retaliation in one or more ways of which she complained to Marks, including but not limited to

SECOND AMENDED QUI TAM COMPLAINT – Page 7

being ostracized from other members of nurse leadership at Defendant, threats by Mabry of termination of her employment, exclusion from communications and meetings by Madden and other retaliatory conduct by Gessling. On July 31, 2020, Madden and Marks terminated the employment of Relator with Defendant, saying it was best to "sever ties." She was given the choice to resign or be fired, and the circumstances having become intolerable and being threatened with termination and concerned about the inability to obtain subsequent employment if she was terminated by Defendant, she resigned by letter dated August 3, 2020 under circumstances constituting constructive discharge. She specifically identified both her desire to remain employed by Defendant and Defendant's threat of termination if she did not resign in her resignation letter. On or about July 31, 2020, Relator reported the adverse conduct of Defendant with respect to care of Medicare patients to MDMC for Medicaid Services and also reported the adverse conduct of Defendant with respect to patients generally to state regulatory agencies with jurisdiction over MDMC and Medicaid patients. Prior to July 31, 2020, Relator had complained to Floyd that conduct of Defendant and MDMC constituted Medicare and Medicaid fraud. After Relator was constructively discharged, Defendant offered pretextual reasons for terminating her.

26.     Relator was terminated in August 2020 for raising objections to the illegal practices described herein.

**B.      Methodist Health Care Systems**

27.     MHD is a Texas non-profit corporation. The stated mission of MHD is to serve people in defined service areas by meeting their health needs.  This mission is pursued by operating four general acute-care hospitals and other healthcare services, education and support programs needed by the communities in North Central Texas.

28.      The Hospitals that are part of MHS are MDMC, a 556 licensed bed teaching referral hospital; Methodist Charlton Medical Center (MCMC), a 317 licensed bed hospital; Methodist Mansfield Medical Center (MMMC), a 254 licensed bed hospital; and Methodist Richardson Medical Center (MRMC), which now operates a 469 licensed bed hospital across two campuses.

29.     The primary offices of MHD and MDMC is 1441 N. Beckley Avenue, Dallas, Texas, 75203. Collectively, Defendant has over 1.6 billion in revenue each year and have over 9,000 employees.

**III.      Jurisdiction and Venue**

30.     Many or all of the acts proscribed by 31 U.S.C. §3729 *et seq.* and complained of herein occurred within the Northern District of Texas, and Defendant does business in the Northern District of Texas. Therefore, this Court has jurisdiction over this case pursuant to 31 U.S.C. 3732 as well as under 28 U.S.C. §§ 1331 and 1345.  Venue lies under 31 U.S.C. § 3732.

31.     The allegations which give rise to Relator's Complaint are not taken primarily from disclosures of specific information relating to allegations or transactions from any criminal, civil, or administrative hearing, a congressional, administrative, or Government [General]

Accounting Office report, hearing, audit, or investigation, or from the news media. Relator is the original source of the information upon which this complaint is based, as that phrase is used in the FCA and TMFPA.

32.    Prior to filing the Complaint, Relator has voluntarily provided the United States with material evidence in a Disclosure Statements, with exhibits, as part of Relator's obligation to provide the government with material information prior to filing a Complaint in accordance with 31 U.S.C. § 3730(b)(2).

### IV.    Background on Hospital Acquired Pressure Infections (HAPI)

### A.    Pressure Injuries

33.    A Hospital-Acquired Pressure Injury (HAPI) is a new pressure injury that develops after admission to a hospital. According to the National Pressure Ulcer Advisory Panel (NPUAP), the leading scientific authority on pressure injury prevention and treatment, "*a pressure injury (PI) is localized damage to the skin and underlying soft tissue usually over a bony prominence or related to a medical or other device.*"

34.    The pressure injury can either present as intact skin or an open ulcer and usually occurs over a bony prominence. The National Pressure Ulcer Advisory Panel (NPUAP) recently changed the terminology to "*pressure injury*" from the former "*pressure ulcer*" description as a more accurate label since not all presentations are open ulcers, yet all can be legitimately classified as tissue injuries.[5]

35.    The injury can occur as a result of sustained or intense pressure or pressure in combination with shear force found to occur among individuals who are bedridden, wheelchair users or wearing a medical device.[6]

SECOND AMENDED QUI TAM COMPLAINT – Page 10

36.    Pressure injuries (PI), however, can occur in individuals of all ages. Deep Tissue Pressure Injury (DTPI) is an advanced type of pressure injury described as a localized area of non-blanchable, deeply discolored, intact or non-intact skin caused by pressure or shear force related injury at the interface of underlying muscle and bone.

37.    Initial tissue changes related to DTPIs can develop quickly. High pressure can cause the first signs of damage within deep tissue in minutes and subsequent ischemia-related damage can occur within hours.[7]

38.    The NPUAP pressure injury staging system is the gold standard for classification of pressure injuries. The wound is numerically classified as Stage 1 or 2 or 3 or 4, depending on the deepest tissue type exposed. The following definitions are taken from the NPUAP.[8]

Stage 1 Pressure Injury: Intact skin with non-blanchable redness of a localized area. The area may be painful, firm, soft, warmer or cooler as compared to adjacent tissue.

Stage 2 Pressure Injury: Partial-thickness loss of skin with exposed dermis. The wound bed is viable, pink or red, moist, and may also present as an intact or ruptured serum-filled blister. These injuries commonly result from adverse microclimate and shear in the skin over the pelvis and shear in the heel.  This stage should not be used to describe moisture associated skin damage including medical adhesive related skin injury.

Stage 3 Pressure Injury: Full-thickness skin loss in which subcutaneous fat may be visible; however, bone, tendon, or muscles are not exposed. The depth of a Stage 3 pressure injury varies by anatomical location. Stage 3 Pressure Injury. pressure ulcers can be shallow, particularly on areas that do not have subcutaneous tissue, such as the bridge of the nose, ear, occiput and malleolus.

Stage 4 Pressure Injury: Full-thickness skin and tissue loss with exposed or directly palpable with exposed bone, tendon, cartilage, or muscle in the ulcer. The depth of a Stage 4 pressure injury varies by anatomical location. The bridge of the nose, ear, occiput and malleolus do not have subcutaneous tissue and these ulcers can be shallow. Areas with a lack of subcutaneous fat layers makes progression of pressure ulcers from Stage 2 to Stage 3 or 4 a concern.[9]

SECOND AMENDED QUI TAM COMPLAINT – Page 11

39.     Stage 3 (full-thickness skin loss) and Stage 4 (full-thickness skin loss and tissue loss) pressure injuries are considered a "never event" and included in the stages of PIs considered "never events" by CMS. Stages of pressure injuries considered "never events" by CMS category list of HACs as non- reimbursable by CMS. [10]

**B.     Hospital Responsibility For Pressure Injuries**

40.     CMS has placed responsibility of HAPIs on the admitting hospital by providing increasing incentive for hospitals to identify "at risk" patients and to implement preventive measures which include the assessment of penalties.

41.     HAPIs are a serious problem in patient care and has deleterious implications for the patient and the healthcare system. HAPIs leads to enormous patient suffering as well as an excessively high healthcare expense.

42.     With the cost of treating a single instance as high as $40,000, and which are not reimbursable by many payers, including Medicare and Medicaid, the economic case for prevention is apparent. [11] HAPIs also are the second most common basis for a hospital lawsuit after wrongful death, claiming 60,000 patients per year, based on a study published by Ostomy/Wound Management. [12]

43.     The need to decrease the incidence of HAPIs in any surgical intensive care units and medical intensive care units (SICU/MICU) is vital. The financial impact of these events is significant, with a cost ranging from $2,000-$40,000 per PI depending on the stage of the PI (NPUAP, 2014). The cost alone, without the cost of human suffering, demonstrates the importance of preventing PIs and the importance of cost-effective preventative practices (Ostadabbas et al., 2012).

SECOND AMENDED QUI TAM COMPLAINT – Page 12

44.     The scope of the problem is significant on multiple levels. Estimates indicated that one to three million people in the United States develop PIs each year (Kruger, Pires, Ngann, Sterling, & Rubayi, 2013). The Joint Commission on Patient Safety estimates that more than 2.5 million patients in acute care facilities suffer from PIs and that 60,000 deaths from PI-related complications each year (Kruger et al., 2013).  The Joint Commission, Quick Safety, 2016; 25. https://www.jointcommission.org/assets/1/23/Quick_Safety_Issue_25_July_20161.pdf

**C.     The Regulatory Response by CMS to Control and Limit HAPIs**

45.     As indicated, CMS identifies PIs as "Never Events"; i.e., an event that a patient should not incur while in a hospital, and CMS accordingly no longer provides reimbursement for care related to these events.

46.     In October 2008, as a result of the Deficit Reduction Act of 2005, CMS instituted a policy to withhold reimbursement to acute care hospitals for the costs of treating hospital-acquired conditions including pressure injuries.

47.     Section 5001(c) of Deficit Reduction Act of 2005 requires the Secretary to identify conditions that are: (a) high cost or high volume or both, (b) result in the assignment of a case to a DRG that has a higher payment when present as a secondary diagnosis, and (c) could reasonably have been prevented through the application of evidence-based guidelines.

48.     On July 31, 2008, in the Inpatient Prospective Payment System (IPPS) Fiscal Year (FY) 2009 Final Rule, CMS included 14 categories of HACs[13], including  Stage 3 and 4 PIs.

SECOND AMENDED QUI TAM COMPLAINT – Page 13

**D.      The Hospital-Acquired Condition Reduction Program**

49.      The HACRP is a Medicare value-based purchasing program that reduces payments to hospital based on how they perform on measures of hospital-acquired conditions.

50.      The HACRP supports CMS's long-standing effort to link Medicare payments to health care quality in the inpatient hospital setting. The HACRP encourages hospitals to implement best practices to reduce their rates of HAIs and improve patient safety.

51.      Section 3008 of the Affordable Care Act (ACA) amended Section 1886(p)(6)(B) of the Social Security Act to establish the statutory authority and requirements for the HACRP, which requires the Secretary of the U.S. Department of Health and Human Services (HHS) to adjust payments to hospitals that rank in the worst-performing 25 percent of all subsection (d) hospitals with respect to HAC quality measures.

52.      On an annual basis, CMS evaluates overall hospital performance for the program by calculating a Total HAC Score for each hospital as the equally weighted average of their scores on measures included in the program. Hospitals with a Total HAC Score in the worst-performing 25 percent of all Total HAC Scores are subject to a 1-percent payment reduction. This payment adjustment applies to all Medicare fee-for-service discharges for the applicable fiscal program year when CMS pays hospital claims.

53.     CMS uses the Total HAC Score to determine the worst-performing 25 percent of all subsection (d) hospitals based on data for the following six quality measures:

- CMS Patient Safety and Adverse Events Composite (CMS PSI 90)[14]

- Five chart-abstracted measures of HAIs submitted to the Centers for Disease Control and Prevention's National Healthcare Safety Network:

    1.     Central Line-Associated Bloodstream Infection (CLABSI)

    2.     Catheter-Associated Urinary Tract Infection (CAUTI)

    3.     Surgical Site Infection (SSI) for abdominal hysterectomy and        colon procedures

    4.     Methicillin-resistant Staphylococcus aureus (MRSA)

    5.     Bacteremia Clostridium difficile Infection (CDI)

54.     CMS is required to publicly report hospitals' performance in its quality reporting programs. Before publicly reporting results, CMS sends confidential Hospital-Specific Reports to hospitals. CMS gives hospitals 30 days to review their HAC Reduction Program data, submit questions about the calculation of their results, and request corrections.  After this process is complete, CMS publicly reports hospitals' quality measure scores. Attached hereto as Exhibit A is a copy of the form[15] of MDMC's Discharge level information for CMS PSI 90 calculation for the 2021 HAC Reduction Program that receives monies from CMS.

SECOND AMENDED QUI TAM COMPLAINT – Page 15

## V.    Defendant's Scheme To Defraud

### A.    Underreporting HAPI's to  Avoid The Penalty

55.    Defendant has been "gaming the system" to avoid financial penalties under HACRP for what is deemed "poor performance" by underreporting HAPI rates of occurrence that would have placed Defendant in the lowest quartile of all reporting hospitals, subjecting it to a one per cent (1%) reduction in Medicare reimbursement and to even earn "incentive payments." Defendant acted in bad faith and turned a "blind eye" to authoritative guidance indicating that their practices were wrong and fraudulent.

56.    Defendant, in violation of Federal laws, CMS regulations and guidelines, knowingly (i) directed nursing staff to change diagnosis of HAPIs or not record the occurrence of HAPIs, (ii) recorded incorrect diagnosis codes to hide the occurrence of HAPIs, and (ii) failed to accurately record or code HAPIs, all to circumvent the HACRP established by 42 U.S.C. § 1395(ww)(p). The HACRP is a "Medicare law" within the meaning the Provider Form CMS-855A[16],  CMS Claim Form 1500[17], and Cost Report UB-92[18], which certifications and representations are incorporated into the HACRP.

57.    On multiple occasions, Defendant's hospital inpatients have developed HACs, including stage 3 and 4 PIs. In order to improve its HAC quality measurement, Defendant used incorrect diagnosis codes for patients who developed HACs and engaged in a pattern and practice described above to improve its HAC scores and avoid being placed in the lowest quartile under HACRP.

58.     As an example, on its July 2020 Quality Scorecard (attached hereto as <u>Exhibit B</u>), HAPI Stage 2 indicator was listed as "0", not only meeting the target but placing it in the top quartile when in fact, there were in fact 61 stage 2 HAPI PIs that occurred during this very same reporting period.

59.     If Defendant had properly accounted for and reported HAPIs in the HACRP HQR System, Defendant's Total HAC Score would have placed Defendant in the lowest quartile of all reporting hospitals, subjecting it to a one per cent (1%) reduction in Medicare reimbursement. payments.

60.     If HAPI rates had been reported accurately, Defendant was at risk of being penalized over $6.76 million based on Medicare funding of at least $676 million dollars for the period of October 1, 2019 to September 30, 2020.

61.     The results would have been the same or similar for each fiscal year since the inception of the HACRP in fiscal year 2015, representing penalties of at least $33 million.

**B.      Defendant's Failure To Follow Data Collection Process For the HACRP**

62.     Each program year, CMS generates a Hospital-Specific Report (HSR) for each hospital eligible for the HACRP based on data provided by the Hospital.

63.     The HSR is a Microsoft Excel file that contains information to enable hospitals to review the calculation of their program results. The file presents the following information:

● Total HAC Score

● Measured results for the Patient Safety and Adverse Events Composite (CMS PSI 90) and the Centers for Disease Control and Prevention's (CDC) National Healthcare Safety Network (NHSN) HAI measures as well as additional information to replicate the Winsorized[19] z-scores, including the (I) 5th percentile measure result, (ii) 95th percentile measure result, (iii) mean

Winsorized measure result, (v) Standard deviation of Winsorized measure results, (vi) CMS PSI 90 component measure results, (vii) discharge-level data used to calculate CMS PSI 90 measure results and (viii) observed infections, predicted infections, and volume variables used to calculate standardized infection ratios for the CDC NHSN HAI measures.

64.    Hospital staff, registered as Quality Net Secure Portal users, can access HSRs. Users must be assigned one of the following two roles: Hospital Reporting Feedback – Inpatient role: the person required to receive the report, and File Exchange & Search role: the person required to download the report from the QualityNet Secure Portal. It is believed that Sherri Floyd and Jeri Harlan, assistants to MDMC Chief Nursing Officer Barbara Madden, and possibly Linda Scribner, MDMC Quality Director, filled these two roles at MDMC.

65.    Data on HAPIs that are Stage 2 and above are collected quarterly and placed into National Database of Nursing Quality Indicators[20] (NDNQI) by the wound care nurses. This data is collected through the following process: One day a quarter two nurses from each department assist wound care nurses by going from floor to floor and looking at all patient's skin. If a PI is identified, it is reported to the wound care nurses. The wound care nurses would them evaluate the wound. If it was a PI that was not previously known based on charting, it would be deemed an HAI and reported by the wound care nurse. This data was input into the NDNQI website for reporting purposes quarterly. Relator was asked to have the wound care nurses and herself input the data in April or May of each year.

66.    Specifically, attached hereto as Exhibit C is a printout of a computer record that is required solely for HAPIs to be completed and input into the NDNQI system. This electronic record is essential to the HCARP. The patient specific data that is required includes (I) date the PI was identified, (ii) days between admission and HAPI, (iii) a skin assessment verified by two

SECOND AMENDED QUI TAM COMPLAINT – Page 18

nurses, and (iv) notification to the attending physician. Once identified, additional information is required to be disclosed, including (i) the Braden score[21] trends, (ii) clinical assessments, including documentation in EPIC whether the patient was turned every 2 hours, (iii) out of bed activity, and (iv) patients level of consciousness.

67.     Attached as Exhibit D is an email chain that took place as recently as June 30, 2021 to July 1, 2021, acknowledging, at best that *"maybe half of them"* are *"properly"*[22] implementing established nursing quality indicators to avoid HAPIs. This demonstrates the lack of quality nursing that results in HAPIs. Specifically, in response to a specific patient who was found to have five (5) HAPIs, Kristen Epley urged several in the team of nurses that the case should be reviewed to *"identify our opportunities to improvement that can make patients safer."* In response, Dawn Huggins, one of the recipients stated that *"I rounded today and went over proning. Will continue to actively round and see if positioners in place and being used properly."* In response Kristen Epley replied. . . "*Are they being used properly*?" In response to that question, Dawn Huggins acknowledged. . . "*Maybe half of them*?" Huggins indicated that she did *"education today with them, and I will coach in real time. I did let them know that we are rounding daily, and I am reviewing for MANDATORY q 4 rounding."* Kristen Epley, aware of the necessary quality indicators, replied . . . *Please try to enforce every 2 hours; 4 hours is way too long . . . more than likely, will not be able to decrease the HAPI rate with four*."

68.     In addition to a lack of care regarding nursing standards and documentation of HAPIs, when nurses at MDMC attempted to document them properly, they were routinely asked to change documentation to reflect that a HAPI was *not* even present. Specifically, Barbara Madden asked this of Kristy Epley who was a wound care registered nurse, after a State Texas regulatory visit by Rosemarie Massey, from the Texas Health and Human Services Commission, holding the title of Nurse III, Health Quality Section 2.

### C.     Defendant's Failed to Provide Required Supervision of Nursing Care

69.     Defendant is required, as a mandated standard of care, that its registered nurses document, supervise and evaluate their nursing care for each patient. 42 CFR 482.23(b)(3).

70.     In addition to federal requirements, Texas law requires such documentation to include the status and assessment of the patient's condition, nursing care rendered to the patient, physician orders on medications and treatments and the response and evaluation of the patient when an intervention has been made. Texas Administrative Code Title 22 Part II Section 217.11(1)(D) and 133.41(o)(D)(2).

71.     Defendant failed to provide the standard of care and failed to document the care that was provided of multiple patients suffering HAPIs in 2020 and previously, and also, on information and belief, since. Relator became aware during periods in 2020 that there was no documentation by nursing staff for treatment plans recommended by wound care nurse. This included failure to document necessary measures such as (1) turning and repositioning every two hours as required, (2) use of foam, Aquacel AG or iodosorb to treat pressure injuries.

72.     As a direct result of Relator's complaints, both CMS and representatives of the State of Texas have investigated Relator's claims and confirmed the deficiencies and lack of compliance. Copies of the CMS-2567 Statement of Deficiencies and Texas Health and Human

SECOND AMENDED QUI TAM COMPLAINT – Page 20

Services Statement of Deficiencies are attached hereto as Exhibit E. In addition, as far back as 2018, the State of Texas, in a previous state visit in June 2018, found that nurses were not turning their patients and also not providing required discharge instructions to patients in regards to wound care. Additionally, Relator began working with nursing leadership and wound care nurses regarding documentation of care to patients. This attempt to strive for compliance led to the backlash that resulted in her termination.

### D. Defendant's Knowingly Disregarded The Lack of Proper Care

73. In and prior to 2020, and on information and belief, since, John Phillips, MDMC President of MDMC and Dr. Leslie Cler, MDMC Chief Medical Officer, were aware of the lack of nursing care regarding HAPIs, specifically in its Intensive Care Unit (ICU). Dr. Cler was informed of the problem by Dr Maryam Raza, a wound care physician at MDMC. Despite being informed, he refused and failed to intervene.

74. In and prior to 2020, and on information and belief, since, Amy Mabry, the ICU Director of Nursing at MDMC, was fully aware of the extent of the problem with the occurrence of HAPIs at an unacceptable level but also failed to take any meaningful corrective action.

75. In and prior to 2020, and on information and belief, since, Barbara Madden and Linda Scribner were also fully aware of the lack of nursing care that resulted in HAPIs and failed to take any meaningful action.

76. In and prior to 2020, and on information and belief, since, Pamala Gessling, MDMC Director of Nursing for Women's Services, Women's Service and Urology/GYN medical unit, was aware of the occurrence of HAPIs at an unacceptable level but failed to take any meaningful corrective action.

SECOND AMENDED QUI TAM COMPLAINT – Page 21

### VI.    Defendant's Violation of The False Claims Act

### A.    The False Claims Act

### 1.    The FCA And False Certification

77.    The FCA is "intended to reach all types of fraud, without qualification, that might result, in financial loss to the government." *United States v. Neifert- White*, 390 U.S. 228, 232 (1968).  Relator alleges that Defendant violated the FCA by causing the submission of false claims[23], all in violation of 31 U.S.C. § 3729(a)(1)(A). (B) and (G). Section (A) of the FCA imposes liability on any person who *"Knowingly presents or causes to be presented a false or fraudulent claim for payment or approval."* 31 U.S.C. § 3729(a)(1)(A), as amended May 20, 2009.[24]

78.    A false certification (express or implied) establishes the "falsity" of a claim under the FCA.  This was emphasized by Congress in the 1986 Amendments to the FCA, stating "each and every claim submitted under a contract, loan guarantee or other agreement which was originally obtained by means of false statements or other corrupt and fraudulent conduct, or in violation of any statute or appropriate regulation, constitutes a false claim." S. Rep. No. 99-345 at 9 (1986), reprinted in 1986 U.S.C.C.A.M. 5266, 5274.

79.    Section 3729(a)(1)(A) requires only that a claimant present a 'false or fraudulent claim for payment or approval' without the additional element of a 'false record or statement.' *Id.*  Thus § 3729(a)(1)(A) allows a relator to bring a claim based on a defendant submitting a false claim for government funds without explicitly making a false statement.

80.    The FCA, 31 U.S.C. § 3729(a)(1)(B), makes "knowingly" making, using, or causing to be used or made, a false record or statement to get a false or fraudulent claim paid or approved by the Government, a violation of federal law for which the United States may recover

SECOND AMENDED QUI TAM COMPLAINT – Page 22

three times the amount of the damages the Government sustains and a civil monetary penalty of between $10,781 and $21,563.00 per claim.

81. A legally false FCA claim is based on a 'false certification' theory of liability." *Id.* A claim is legally false when the claimant knowingly falsely certifies that it has complied with a statute or regulation which is material to the Government's decision whether to make payment for the goods or services.

82. Within the theory of false certification, there are two further categories: express and implied false certification. A defendant violates the FCA by an express false certification when, in conjunction with a request for federal funds, it certifies that it is in compliance with regulations that are requirements for payment.

83. An FCA violation occurs under implied false certification when a Defendant submits a claim for payment that makes specific representations about the goods or services provided, but knowingly fails to disclose noncompliance with a statutory, regulatory, or a contractual requirement. In these circumstances, liability may attach if the omission renders those representations misleading. *United States ex rel. Escobar, 2*016 WL 3317565, slip op., No. 15-7 (June 16, 2016).

84. The false statements contained in Defendant's required reporting of HACs through the HACRP CMS Hospital Quality Reporting (HQR) System were subject to the express certifications made by Defendant in the HACRP filings and submissions as well as express certifications made by Defendant in CMS Forms 885A, 1500 and UB-92.

85. In addition, the false statements contained in Defendant's required reporting of HACs through the HACRP CMS Hospital Quality Reporting (HQR) System constituted a false record.

86.    Last, the Medicare statute expressly provides that services will not be reimbursed unless they are "*reasonable and necessary*," 42 U.S.C. § 1395y(a)(1)(A). Thus, a certification of necessity is at least implied in claims for reimbursement under that statute and is expressly required through the CMS 855A Provider Agreement.

**2.    Factors to Consider in Materiality: "Natural Tendency Test"**

87.    The Supreme Court, in *Escobar,* reaffirmed that the proper test for determining materiality in FCA cases is whether the conduct at issue has "a natural tendency to influence, or [is] capable of influencing, the payment or receipt of money or property." 136 S. Ct. at 2002 (citing 31 U.S.C. § 3729(b)(4); *Neder v. United States*, 527 U.S. 1, 16 (1999); *Kungys v. United States*, 485 U.S. 759, 770 (1988)). This approach is consistent with the statutory text of the FCA, which was amended in 2009 to expressly incorporate the "natural tendency" test, thereby rejecting a more onerous "outcome materiality" standard that some courts had adopted. See Pub. L. No. 111-21 at § 4 (2009) (The Fraud Enforcement and Recovery Act of 2009 ("FERA")).

88.    The Supreme Court, in *Escobar,* identified a variety of factors bearing on this holistic assessment, including whether –

- whether the requirement violated is a condition of payment,

- whether the requirement violated is significant or "minor or insubstantial,"

- whether the violation goes to the "'essence of the bargain," and

- how the Government has treated similar violations when it had "actual knowledge" of

them. Each year, CMS sends hospitals confidential Hospital-Specific Reports (HSRs) that contain detailed program information and calculations for them to review. CMS gives hospitals 30 days to review their HACRP data, submit questions about the calculation of their results, and request corrections to the scoring. After the Scoring Calculations Review and Correction period,

SECOND AMENDED QUI TAM COMPLAINT – Page 24

CMS publicly reports hospitals' HACRP data on the Provider Data Catalog Website.[25] In this regard, the Government, through CMS, has consistently taken enforcement action to assess penalties under the HACRP. So far, the program has penalized 1,978 hospitals at least once since it was established in 2014. Of those, 1,360 hospitals have been penalized at least twice, and 77 hospitals have been penalized each year the program has been in place.

### 3.  The FCA's Broad Definition of "Knowingly"

89.    "Knowingly," for purposes of the FCA, means the defendant (1) had actual knowledge that the claim is false; or (2) acted with deliberate ignorance of the truth or falsity of the claims; or (3) acted with reckless disregard of the truth or false of the other claim.  31 U.S.C. § 3729(b)(1)(A)(1-3) and Section 3729(b)(1)(B).

90.    The FCA, 31 U.S.C. § 3729(a)(1)(A), makes "knowingly"[26] presenting or causing to be presented to the United States any false or fraudulent claim for payment a violation of federal law for which the United States may recover three times the amount of the damages the government sustains and a civil monetary penalty of between $10,781 and $21,563.00 per claim[25].

**B.  The Affordable Care Act (ACA) Requires
Overpayments Be Reported and Returned**

91.     The ACA defines "overpayment" as *"any funds that a person receives or retains
under [Medicare] to which the person, after applicable reconciliation, is not entitled."* Id. §
1320a-7k(d)(4)(B). It further requires that any *"overpayment . . . be reported and returned
[within] 60 days after the date on which the overpayment was identified."* Id. § 1320a-
7k(d)(2).*"Any overpayment retained by a person after the deadline for reporting and returning
the overpayment . . . is an obligation (as defined in section 3729 (b)(3) of title 31) for purposes of
section 3729 of such title.");* see False Claims Act, 31 U.S.C. § 3729 et seq.  *United Healthcare
Ins. Co. v. Price*, 248 F. Supp. 3d 192, 2017 U.S. Dist. LEXIS 48913 (D.D.C. 2017)**.**

92.     The FCA, 31 U.S.C. § 3729(a)(1)(G), makes anyone who knowingly makes, uses
or caused to be made or used, a false record or statement, material to an *obligation to pay or
transmit* money or property to the government, or knowingly conceals or knowingly and
improperly avoids or decreases an *obligation to pay or transmit money to the government* liable
for three times the amount of the damages the Government sustains and a civil monetary penalty
of between $10,781.00 and $21,563.00.  The plain text of the FCA's reverse claims provision is
clear: any individual who "knowingly conceals or knowingly and improperly avoids or decreases
an *obligation to pay or transmit* money or property to the Government" may be subject to
liability.

93.      The filing of original and any supplemental records in HACRP reporting by Defendant constituted a record or statement that was knowingly false and inaccurate in that the term "information" encompasses the data submitted for processing. As such, it was, in part, designed to conceal and improperly avoid its obligation to correct the HACRP filings as described herein.

94.      Defendant's actions in knowingly concealing the errors in data in the HACRP reporting and failing, and refusing to amend, correct and return reimbursements that were subject to assessment of a penalty as well as repay a bonus or merit payment received, were intended to improperly avoid or decrease an *obligation* Defendant had to pay or transmit funds to the United States and violates 31 U.S.C. § 3729(a)(1)(G).  Any *overpayment not reported and returned within 60 days after the date on which the overpayment was identified. becomes an "obligation"* for purposes of the FCA. 42 U.S.C. § 1320a-7k(d)(2).

## VII.  Causes of Action

### A.  COUNT ONE

### THE FCA: 31 U.S.C. § 3729(a)(1)(A)

95.      The allegations of paragraphs 1 - 83 are incorporated herein as if more fully set forth at length.

96.      The FCA, 31 U.S.C. § 3729(a)(1)(A), makes "knowingly" presenting or causing to be presented to the United States any false or fraudulent claim for payment, a violation of federal law for which the United States may recover three times the amount of the damages the government sustains and a civil monetary penalty of between $10,781 and $21,563.00 per claim.

97.     The false statements contained in Defendant's required reporting of HACs through the HACRP HQR System were subject to the express certification made by Defendant in the report submissions as well as CMS Form 885A, CMS Form 1500 and UB-92.

## B.  COUNT TWO

### THE FCA: 31 U.S.C. § 3729(a)(1)(B)

98.     The allegations of paragraphs 1 - 86 are incorporated herein as if more fully set forth at length.

99.     The FCA, 31 U.S.C. § 3729(a)(1)(B), makes "knowingly" making, using, or causing to be used or made, a false record or statement to get a false or fraudulent claim paid or approved by the Government, a violation of federal law for which the United States may recover three times the amount of the damages the Government sustains and a civil monetary penalty of $10,781.00 and $21,563.00.

100.     The false statements contained in Defendant's required reporting of HACs through the HACRP CMS Hospital Quality Reporting (HQR) System constituted a false record.

## C.    COUNT THREE

## THE FCA: 31 U.S.C. § 3729(a)(1)( G )

101.    All of the allegations set forth herein in paragraphs 1 - 89 are incorporated herein by reference as if fully set forth at length.

102.    The FCA, 31 U.S.C. § 3729(a)(1)(G), makes anyone who knowingly makes, uses or caused to be made or used, a false record or statement, material to an *obligation to pay or transmit* money or property to the government, or knowingly conceals or knowingly and improperly avoids or decreases an *obligation to pay or transmit money to the government* liable for three times the amount of the damages the Government sustains and a civil monetary penalty of between $10,781.00 and $21,563.00.

103.    The plain text of the FCA's reverse claims provision is clear: any individual who "knowingly conceals or knowingly and improperly avoids or decreases an *obligation to pay or transmit* money or property to the Government" may be subject to liability.

104.    The false statements contained in Defendant's required reporting of HACs through the HACRP HQR System constituted a record or statement that was knowingly false and inaccurate and was, in part, designed to conceal and improperly avoid its obligation to correct the HACRP filings as described herein, including obligations to return the reimbursement funds that were received as a result of the avoidance of the HARCP penalty.

105.    Any overpayment retained by a person after the deadline for reporting and returning the overpayment is an obligation. 31 U.S.C. § 3729(a)(1)(G).

### D.    COUNT FOUR

**TEXAS FCA:**
**TEXAS HUMAN RESOURCES CODE §§ 36.001(1), (2), (4), (5) AND 9**

106.    The allegations of paragraphs 1 - 94 are incorporated herein as if more fully set forth at length.

107.    Defendant knowingly or intentionally reported to the State of Texas' Medicaid Program false statements or misrepresentations regarding their pharmaceutical products. These actions were repeated and continuous violations of the TMFPA.

108.    Defendant violated the TMFPA in the following respects:

a.    Section 36.002(1) prohibits a person from knowingly or intentionally making or causing to be made a false statement or misrepresentation of material fact on an application for a contract, benefit, or payment under the Medicaid Program, or that is intended to be used to determine a person's eligibility for a benefit or payment under the Medicaid Program;

b.    Section 36.002(2) prohibits a person from knowingly or intentionally concealing or failing to disclose an event that permits a person to receive a benefit or payment that is not authorized, or that permits a person to receive a benefit or payment that is greater than the benefit or payment that is authorized;

c.    Section 36.002(4) prohibits a person from knowingly or intentionally making or causing to be made a false statement or misrepresentation of fact concerning information required to be provided by a federal or state law, rule, regulation or provider agreement pertaining to the Medicaid Program;

d.    Section 36.002(5) prohibits a person, except as authorized under the

SECOND AMENDED QUI TAM COMPLAINT – Page 30

Medicaid program, from knowingly paying, charging, soliciting, accepting, or receiving, in addition to an amount paid under the Medicaid program, a gift, money, a donation, or other consideration as a condition to the provision of a service or product or the continued provision of a service or product if the cost of the service or product is paid for, in whole or in part, under the Medicaid Program; and

e.      Section 36.002(9) prohibits a person from knowingly entering into an agreement, combination, or conspiracy to defraud the state by obtaining or aiding another person in obtaining an unauthorized payment or benefit from the Medicaid program or a fiscal agent.

### E.      COUNT FIVE

### TEXAS HEALTH & SAFETY CODE § 161.134

109.    For her fifth cause of action, individually, Plaintiff would show that Defendant violated §161.134 of the Texas Health & Safety Code in that it terminated her employment, and otherwise discriminated and retaliated against her, for making one or more reports reporting to the employee's supervisor, an administrator of the facility, a state regulatory agency, or a law enforcement agency of a violation of law, including a violation of this chapter (the public health provisions chapter, Chapter 161 of the Texas Health & Safety Code), a rule adopted under this chapter (Chapter 161 of the Texas Health & Safety Code), or a rule of another agency (other than a state regulatory agency). Plaintiff is entitled to a rebuttable presumption that her employment was terminated and that she was subjected to discrimination, retaliation and termination of her employment for making each such report, since such discrimination, retaliation and termination occurred in each case within 60 days after the date on which she made each such report in good faith. Plaintiff is accordingly entitled to recover her past and future lost compensation and

SECOND AMENDED QUI TAM COMPLAINT – Page 31

benefits, other actual damages, including compensatory damages in the form of mental anguish and loss of reputation, punitive damages, prejudgment interest, attorney's fees and costs of court.

### F.    COUNT SIX

### THE FCA: 31 U.S.C. § 3730(h)

110.    For her sixth cause of action, individually, Plaintiff would show that MHS violated 11 U.S.C. 3730(h) of the FCA in that Plaintiff, as an employee of MHS, was discharged, and harassed and otherwise discriminated against in the terms and conditions of her employment, because of lawful acts done by Plaintiff in furtherance of an action under11 U.S.C. 3730. Plaintiff is accordingly entitled to recover twice her past lost compensation and benefits, interest on such amount, her future lost compensation and benefits, and other special damages, including compensatory damages in the form of mental anguish and loss of reputation, prejudgment interest, attorney's fees and costs of court.

### VIII.  RELIEF REQUESTED

111. Relator requests the following relief be imposed against Defendant:

(a)    That the United States and Texas be awarded three times the amount of damages which it sustained because of the acts of Defendant pursuant to §3729(a)(1)(A) through (C) of the FCA;

(b)    That each Defendant be held liable for civil penalties of up to $21,563.00, but not less than $10,781.00 (as adjusted pursuant to §3729 of the FCA and the Civil Penalties Act), to the United States for every act in violation of the FCA.

(c)    That this Court award such interest as is available pursuant to the FCA.

(d)    That in the event the United States intervenes in this action and takes over its prosecution, the Relator be awarded an amount for bringing this action on behalf of

SECOND AMENDED QUI TAM COMPLAINT – Page 32

the United States of at least 15% but not more than 25% of the proceeds paid to the

United States resulting from the trial or settlement of the claim, pursuant to §3730(d)(1)

of the FCA;

(e)    That in the event the United States and State of Texas do not intervene in

this action, the Relator be awarded an amount for bringing this action for the United

States of at least 25% but not more than 30% of the proceeds paid to the United States

resulting from the trial or settlement of the claim, pursuant to §3730(d)(2) of the FCA;

(f)    That this Court award reasonable attorneys' fees, costs and expenses to

the Relator, which were necessarily incurred in bringing and prosecuting this case,

pursuant to §3730(d)(1) or (2) of the FCA;

(g)    That this Court award Plaintiff individually all of the relief to which she is

entitled described in paragraphs 109 and 110; and

(h)    That this Court award such other relief as it deems just, necessary and fair.

Relator requests a trial by jury of all issues so triable.

Respectfully submitted,

KILGORE & KILGORE, PLLC
By:    Robert E. Goodman, Jr.
Texas Bar ID 08158100
Kilgore & Kilgore, PLLC
3141 Hood Street, Suite 500
Dallas, Texas 75219
214-379-0823
214-379-0840 (fax)
Email: reg@kilgorelaw.com

SECOND AMENDED QUI TAM COMPLAINT – Page 33

BEGELMAN & ORLOW, P.C.
By:     Marc M. Orlow
        Ross Begelman
411 Route 70 East, Suite 245
Cherry Hill, New Jersey 08034
(856) 428-6020
Email: marc.orlow@begelmanorlow.com
Email: ross.beglman@begelman.orlow.com

ATTORNEYS FOR RELATOR

1:

Relator also made voluntary disclosures to the Centers for Medicare and Medicaid Services and Texas Health and Human Services Commission in August 2020.

2:

NATIONAL ACTION PLAN TO PREVENT HEALTH CARE-ASSOCIATED INFECTIONS: ROAD MAP TO ELIMINATION APRIL 2013, https://health.gov/sites/default/files/2019-09/hai-action-plan-executive-summary.pdf

3:

As used in 42 U.S.C. 1395ww, the term "*subsection (d) hospital*" means a hospital located in one of the fifty States or the District of Columbia **other than**—(i) a psychiatric hospital (as defined in section 1861(f)), (ii) a rehabilitation hospital (as defined by the Secretary),
(iii) a hospital whose inpatients are predominantly individuals under 18 years of age,
(iv) a hospital which has an average inpatient length of stay (as determined by the Secretary) of greater than 25 days [emphasis added].

4:
31 U.S.C. § 3729

5:

National Pressure Ulcer Advisory Panel. NPUAP position statement on staging – 2017 clarifications. National Pressure Ulcer Advisory Panel 2017.http://www.npuap.org/wp-content/uploads/2012/01/NPUAP- Position-Statement-on-Staging-Jan2017.pdf

6:

Oomens CW, Bader DL, Loerakker S, Baaijens F. Pressure induced deep tissue injury explained. Annals of Biomedical Engineering 2015; 43(2), 297-305.

7:
*Id.*.

8:

National Pressure Ulcer Advisory Panel. NPUAP position statement on staging – 2017 clarifications. National Pressure Ulcer Advisory Panel 2017. http://www.npuap.org/wp-content/uploads/2012/01/NPUAP-Position-Statement-on-Staging-Jan2017.pdf. See also Visscher M.O. White CC, Jones JM, Cahill T, Jones DC, Pan BS. Face masks for noninvasive ventilation: Fit, excess skin hydration, and pressure ulcers. Respiratory Care 2015; 60(11): 1536-1547.

9:

Cooper KL. Evidence-based prevention of pressure ulcers in the intensive care unit. Critical Care Nurse 2013; 33(6),57-66

10:

CMS.Gov. Centers for Medicare and Medicaid Services. Hospital-Acquired Conditions (Present on Admission Indicator). March 17, 2018.

11:
"By the Numbers: CHPSO Pressure Injury Data," Aug. 4, 2017

12:

Bauer, K., Rock, K., Nazzal, M., Jones, O., Qu, W., "Pressure Ulcers in the United States' Inpatient Population From 2008 to 2012: Results of a Retrospective Nationwide Study," Ostomy Wound Management, November 2016.

13:
These included Air Embolisms, Falls and Trauma Fractures, Dislocations, Intracranial Injuries, Crushing Injuries, Burn, Catheter-Associated Urinary Tract Infection (UTI), Vascular Catheter-Associated Infection, Surgical Site Infection, Surgical Site Infection Following Certain Orthopedic Procedures, Surgical Site Infection Following Cardiac Implantable Electronic Device (CIED)

14:
The CMS Patient Safety and Adverse Events Composite (CMS PSI 90) is a subset of the AHRQ Patient Safety Indicators and is a more relevant measure for the Medicare population because it utilizes ICD-10 data. The CMS PSI 90 measure summarizes patient safety across multiple indicators, monitors performance over time, and facilitates comparative reporting and quality improvement at the hospital level. The CMS PSI 90 composite measure (updated on August 23, 2018) intends to reflect the safety climate of a hospital by providing a marker of patient safety during the delivery of care.  CMS uses the CMS PSI 90 v.9.0 software to produce the CMS PSI 90 results. CMS has used or is currently using the CMS PSI 90 measure in the following Federal programs: the Hospital Inpatient Quality Reporting Program, Value-Based Purchasing Program, and Hospital-Acquired Condition Reduction Program.

15:
This specific form only contains MOCK data except for national results. MDMC's Hospital Specific Report (HSR) workbook contains discharge-level protected by HIPAA

16:
Medicare Provider Application for Institutional Providers. Expressly provides that Provider certifies compliance with all Medicare laws.

17:
Fee For Service Medicare Claim Form. Expressly provides that Provider certifies compliance with all Medicare laws.

18:
Participating hospitals must file cost reports annually. 42 U.S.C. § 1395g; 42 C.F.R. § 413.20(b). Each year's report covers all the interim requests for reimbursement, such as the UB-92 forms used by hospitals and home health agencies, submitted during that cost reporting year. The UB-92 contains a variety of certifications that must be executed if the request is to be processed, including compliance with all Medicare laws.

19:
"Winsorized" mean is a method of averaging that initially replaces the smallest and largest values with the observations closest to them. This is done to limit the effect of outliers or abnormal extreme values, or outliers, on the calculation.

20:
The National Database of Nursing Quality Indicators TM (NDNQI®) is the only national nursing database that provides quarterly and annual reporting of structure, process, and outcome indicators to evaluate nursing care at the unit level.

21:
The Braden Scale is a scale made up of six subscales, which measure elements of risk that contribute to either higher intensity and duration of pressure, or lower tissue tolerance for pressure. These are: sensory perception, moisture, activity, mobility, friction, and shear. Each item is scored between 1 and 4, with each score accompanied by a descriptor. The lower the score, the greater the risk.

22:
See Exhibit C, pages 2-3; email from Kristy Epley 7/1/2021 to Dawn Huggins.

SECOND AMENDED QUI TAM COMPLAINT – Page 36

23:

The Federal FCA defines a "claim" to include any request or demand, whether under contract or otherwise, for money or property which is made to a contractor, grantee, or other recipient if the United States Government provides any portion of the money or property which is requested or demanded, or if the Government will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested.

24:

The Fraud Enforcement Recovery Act of 2009, Pub. L. No. 111-21, § 4, 123 Stat. 1616 (2009) modified and renumbered the subsections of § 3729(a) ("FERA").

25:

https://www.cms.gov/Medicare/Medicare-Fee-for-Service-Payment/AcuteInpatientPPS/HAC-Reduction-Program

26:

"Knowingly" means the defendant (1) had actual knowledge that the claim is false; (2) acted with deliberate ignorance of the truth or falsity of the claims; or (3) acted with reckless disregard of the truth or false of the other claim. 31 U.S.C. 3729(b)(1)(A)(1-3) and Section 2729(b)(1)(B).

27:

On November 2, 2015, President Obama signed into law the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015 (the 2015 Act), which further amended the Federal Civil Penalties Inflation Adjustment Act of 1990. The 2015 Act updates the process by which federal agencies adjust applicable civil monetary penalties for inflation to retain the deterrent effect of those penalties. The 2015 Act requires that not later than July 1, 2016, and not later than January 15 of every year thereafter, the head of each agency must, by regulation published in the Federal Register, adjust each CMP within its jurisdiction by the inflation adjustment described in the 2015 Act. For violations of the False Claims Act, the interim final rule minimum per-claim CMP's will increase to $10,781 from $5,500, and maximum per-claim CMPs will jump to $21,563 from $11,000. The increase takes effect August 1, 2015 and applies to violations after November 2, 2015.

SECOND AMENDED QUI TAM COMPLAINT – Page 37