IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| Ginger King,<br>ex rel United States of America and the State<br>of Texas, Relators, and Ginger King,<br>individually<br><br>v.<br><br>Methodist Hospital of Dallas, d/b/a Methodist<br>Healthcare Systems and d/b/a Methodist<br>Dallas Medical Center,<br>Defendant | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | CIVIL ACTION NO. 3:21-CV-1923 |

RELATOR GINGER KING'S OPPOSITION TO DEFENDANT
HARRIS HEALTH SYSTEMS' MOTION TO DISMISS

KILGORE & KILGORE, PLLC
By:      Robert E. Goodman, Jr.
Texas Bar ID 08158100
Kilgore & Kilgore, PLLC
3141 Hood Street, Suite 500
Dallas, Texas 75219
214-379-0823
214-379-0840 (fax)
Email: reg@kilgorelaw.com

BEGELMAN & ORLOW, P.C.
By:    Marc M. Orlow
        Ross Begelman
411 Route 70 East, Suite 245
Cherry Hill, New Jersey 08034
(856) 428-6020
Email: marc.orlow@begelmanorlow.com
Email: ross.beglman@begelman.orlow.com

ATTORNEYS FOR RELATOR

TABLE OF CONTENTS

TABLE OF CONTENTS…………………………………………………………………………ii

TABLE OF AUTHORITIES………………………………………………………………..iv

    I.      SUMMARY OF THE CASE………………………………………………...1

    II.     NATURE AND STAGE OF PROCEEDINGS………………………………...1

    III.    INADEQUACIES OF MTD…………………………………………………2

    IV.    FACTUAL ALLEGATIONS OF THE SAC………………………………...4

         A.       HACRP……………………………………………………………5

         B.       Underreporting of HAPIs to Avoid the Penalty……………………...6

         C.       Failure to Follow Mandated Data Collection Process…………………….7

         D.       Defendant Failed to Provide Required Supervision of Nursing Care……..9

         E.       Defendant Knowingly Disregarded the Lack of Proper Care……………10

    V.     STANDARD OF REVIEW………………………………………………...11

         A.       The Rule 8(a) and 12(b)(6) Standard…………………………………11

         B.       The Rule 9(b) Standard………………………………………………..12

    VI.    ARGUMENT………………………………………………………………13

         A.       Relator's First Through Fourth Causes
               are Adequately Plead Under Rule 9(b)………………………………..13

         B.       Relator's First Through Fourth and
               Sixth Causes Are Adequate as Plausible………………………………...13

         C.       Relator's First Through Fourth Counts are Adequate as to Materiality…16

         D.       Relator's First Through Fourth Causes Are Adequate to Plead Scienter..18

         E.       Relator's Fifth Count is Not Subject to Being Dismissed………………19

         F.       Relator's Fourth and Sixth Counts
               Are Not Properly Subject to Dismissal……………………………….20

RELATOR GINGER KING'S OPPOSITION TO DEFENDANT
HARRIS HEALTH SYSTEMS' MOTION TO DISMISS – Page ii

1.    Protected Conduct…………………………………………..20
2.    Notice of Protected Conduct…………………………………..22

3.    No Actionable Employment Action…………………………...22

CERTIFICATE OF SERVICE…………………………………………………..25

RELATOR GINGER KING'S OPPOSITION TO DEFENDANT
HARRIS HEALTH SYSTEMS' MOTION TO DISMISS – Page iii

TABLE OF AUTHORITIES

Cases                                                                      Page(s)

*Ashcroft v. Iqbal*,
    556 U.S. 662, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)...........................................11

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007).........................................11

*Bourne v. Provider Services Holdings, LLC*,
    2019 WL 2010596 (S.D. Ohio 2019).......................................................................23

*Burlington N. & Sante Fe Co. v. White*,
    548 U.S. 53 (2006)...................................................................................................22

*Byrd v. National Health Corp.*,
    2019 WL 403964 (E.D. Tenn. 2019) .......................................................................23

*United States ex rel. Campbell v. Kic Dev., LLC*,
    2019 U.S. Dist. LEXIS 218588 (W.D. Tex. 2019)....................................................17

*Davis v. United Health Services*,
    2020 WL 33597 (W.D. Tex. 2020).....................................................................19, 20

*Dieckman v. Care Convention of Cincinnati, LLC*,
    2018 WL 6675491 (S.D. Ohio).................................................................................23

*United States ex rel. Gonzales v. Fresenius Medical Care N. America*,
    748 F. Supp. 95 (W.D. Tex. 2010)...........................................................................22

*United States ex rel. Grubbs v. Kanneganti*,
    565 F.3d 180 (5th Cir. 2009) ..............................................................................12, 13

*Guerrero v. Total Renal Care, Inc.*,
    2012 WL 899228 (W.D. Tex. 2012)..........................................................................22

*Harrington v. State Farm Fire & Cas. Co.*,
    563 F.3d 141 (5th Cir. 2009) ...................................................................................11

*Jameson v. Fluor Federal Solutions, LLC*,
    2017 WL 3215289 (N.D. Tex. 2017).........................................................................21

*Jones McNamara v. Holzer Health System*,
    630 F. App'x 394 (6th Cir. 2015) .............................................................................22

*United States ex rel. King v. Univ. of Texas Health Science Center-Houston*,
    907 F. Supp. 2d 846 (S.D. Tex. 2012) (Rosenthal, J.).............................................11

RELATOR GINGER KING'S OPPOSITION TO DEFENDANT
HARRIS HEALTH SYSTEMS' MOTION TO DISMISS – Page iv

*Kungys v. United States*,
  485 U.S. 759 (1988).................................................................................................16

*United States ex rel. Lemon v. Nurses to Go, Inc.*,
  924 F.3d at 161 ......................................................................................................17

*United States ex rel. MacKillop v. Grand Canyon Education, Inc.*,
  2022 WL 4084444 (D. Mass. 2022) .......................................................................23

*Neder v. United States*,
  527 U.S. 1 (1999).....................................................................................................16

*United States ex rel. Rafizadeh v. Continental Common, Inc.*,
  553 F.3d 869 (5th Cir. 2008) ..................................................................................12

*Robert v. Bell Helicopter Textron, Inc.*,
  32 F.3d 948 (5th Cir. 1994) ....................................................................................21

*Robertson v. Bell Textron, Inc.*,
  32 F.3d 953 (5th Cir. 2003) ....................................................................................22

*Sealed Appellant I v. Sealed Appellant I*,
  156 F. App'x 630 (5th Cir. 2005) ...........................................................................21

*Smith v. Carolina Med Center*,
  274 F. Supp. 3d 300 (E.D. Pa. 217) .......................................................................18

*Smith v. LHC Group, Inc.*,
  2018 WL 1136072 (6th Cir. 2018) .........................................................................23

*United States ex rel. Steury v. Cardinal Health, Inc.*,
  625 F.3d 262 (5th Cir. 2010) .............................................................................12, 13

*United States ex rel. Tucker v. Christus Health*,
  No. 09-11819, 2012 U.S. Dist. LEXIS 151906 (S.D. Tex. Oct. 23, 2012)
  (Atlas, J.)..................................................................................................................11

*United States v. Neifert-White*,
  390 U.S. 228 (1968).................................................................................................13

*Universal Health Servs., Inc. v. United States ex rel. Escobar*,
  136 S. Ct. 1989, 195 L. Ed. 2d 348 (2016).......................................................16, 17

Statutes

31 U.S.C. § 3729(a)(1).................................................................................................16

31 U.S.C.§ 3729(a)(1)(A) .......................................................................................13, 14

31 U.S.C. § 3729(a)(1)(B) ...................................................................................................13, 14

31 U.S.C. § 3729(a)(1)(G) ..................................................................................................13, 15

31 U.S.C. § 3729(b)(1)(A)(1-3) ..................................................................................................18

31 U.S.C. § 3729(b)(4) .........................................................................................................16, 17

31 U.S.C. § 3730(h) ......................................................................................................... *passim*

42 U.S.C. 1395......................................................................................................................5, 6

False Claims Act .............................................................................................................. *passim*

Fraud Enforcement and Recovery Act.....................................................................................13, 16

Social Security Act ....................................................................................................................5

Texas Health & Safety Code Section 161.134.................................................................4, 19, 20

Texas Medicaid Fraud Prevention Act ................................................................4, 20, 21, 22, 23

Other Authorities

42 C.F.R. § 413.20(b) .................................................................................................................6

42 C.F.R. § 482.23(b)(3)............................................................................................................9

Fed. R. Civ. P. 8(a)(2)...............................................................................................................11

26 R. Lord, Williston on Contracts § 69:12 (4th ed. 2003) ..........................................................17

Texas Administrative Code.........................................................................................................9

Relator submits the following response to Defendant's motion to dismiss her Second Amended Complaint ("MTD"):

## I.    SUMMARY OF THE CASE

Since at least 2016, with the beginning of the Hospital-Acquired Condition Reporting Program ("HACRP") of the Center for Medicaid Services ("CMS"), Defendant has knowingly engaged in several illegal schemes by engaging in the fraudulent activities set forth in Relator's Second Amended Complaint ("SAC").  These activities center on Defendant failing to properly document and report hospital-acquired conditions in order to avoid being penalized under HACRP as well as to receive a performance bonus under HACRP. False certifications, both express and implied, made by Defendant under HACRP, were material to the Government's stated mission to reduce hospital-acquired conditions, and so violated the False Claims Act ("FCA").

## II.    NATURE AND STAGE OF PROCEEDINGS

Relator's original Complaint under the FCA was filed on August 18, 2021. The Government and the State of Texas declined intervention on February 3, 2023 and the seal was lifted on February 10, 2023. The SAC was filed on February 15, 2023.  The MTD was filed on May 15, 2023.

### III.    INADEQUACIES OF MTD

Defendant implies in the MTD that the declination by the United States and the State of Texas is an indication of the merits of Plaintiff's claims under Section 3729 of the FCA. MTD at 2, 4. This is simply false. Courts and the Department of Justice have repeatedly disclaimed any such effect.

The MTD by Defendant is also otherwise replete with misleading assertions as to such claims. Defendant makes insupportable assertions that the SAC does not meet the pleading standard of Rule 12(b)(6) when it notably describes in detail Defendant's scheme to defraud. MTD at 1-21. Furthermore, the MTD specifically claims that the SAC does not adequately meet the pleading specificity requirements of Rules 8(a) and 9(b), arguing the SAC does not identify the *who*, *what*, *why*, *where* and *how* of violations of the FCA, when it again does so in detail. *Id*. at 7-13. Lastly, the MTD makes additional arguments regarding lack of scienter and materiality that directly fly in the face of established law and facts pled in the SAC. *Id*. at 13-21.

Indeed, a close review of the MTD shows that, while the MTD purports to address the key allegations of the SAC supporting those claims, the opposite is true. The SAC is 33 pages long and contains 111 allegations as well as five exhibits. The allegations in paragraphs 55 through 76, and Exhibits B through E, specifically plead facts elaborating Defendant's scheme to defraud supporting Plaintiff's claims under Section 3729, including its underreporting of hospital-associated pressure injuries ("HAPIs") to avoid a CMS penalty, failure to follow a mandated data collection process under the HACRP, failure to provide supervision of nursing care and lack of proper nursing care. Defendant fails to substantively address any of these factual allegations except for a passing reference to the amount of the penalty Defendant was attempting to avoid highlighted in paragraphs 60 and 61 of the SAC.  Instead, Defendant substantively

RELATOR GINGER KING'S OPPOSITION TO DEFENDANT
HARRIS HEALTH SYSTEMS' MOTION TO DISMISS – Page 2

addresses no more than a half-dozen of the allegations of the SAC pertinent to the Section 3729 claims. [SAC, ¶¶ 1, 12, 16, 25, 60, 61]. Thus, it is ignoring a substantial portion of the facts underlying such claims.

Moreover, Defendant also disregards the Exhibits to the SAC, incorporated into the SAC, and the facts supporting such claims evidenced by the exhibits. Exhibit B, the Quality Scorecard, is a document which contains numerous significant measurements, including HAPIs for a specific time period that Defendant used in its HACRP reporting and certifications. [SAC, ¶ 58]. Likewise, Exhibit C is a printout of a computer record required for HAPIs to be recorded and inputted. This record is essential to proper HACRP reporting [SAC, ¶ 66]. Yet, as alleged in the SAC, this is a record nurses were routinely asked to change to reflect that a HAPI was not even present; the SAC provides a specific example of this (Barbara Madden asked this of Kristy Epley after a visit by Texas authorities). [SAC, ¶ 68]. Even with such fraud plainly pled in the SAC, Defendant argues that none of Relator's allegations in the SAC identify the *who*, *what*, *when, how and where* of Defendant's fraud. Similarly, Exhibit D is two email chains with photos included as attachments (showing HAPIs) on May 12, 2020 and then July 1 and 2, 2020. The contents, described in the SAC, document Defendant's lack of compliance with the HACRP with specific examples and instances as well as the harm it was causing. [SAC ¶ 67]. Last, Exhibit E is a deficiency report from a surprise visit on August 10, 2020 by the Texas Health and Human Services Commission ("THHSC") initiated specifically in response to complaints by Relator. The THHSC report substantiated the deficiencies cited by Relator. The THHSC examined ten patient files and found significant deficiencies on five of the ten patients, identifying in specific detail the lack of noncompliance and specific standard of care that was violated patient-by-patient. These facts evidenced by Relator's exhibits to the SAC are all additional facts that

RELATOR GINGER KING'S OPPOSITION TO DEFENDANT
HARRIS HEALTH SYSTEMS' MOTION TO DISMISS – Page 3

Defendant is asking this Court to ignore in its evaluation of Relator's claims under Section 3729 of the FCA.

Defendant similarly makes unserious and even misleading arguments in addressing Relator's employment claims under Section 161.134 of the Texas Health & Safety Code and Section 3730(h) of the FCA and corresponding provision of the Texas Medicaid Fraud Prevention Act ("TMFPA").

A full review of the SAC clearly demonstrates the viability of theories of liability it asserts on behalf of the United States and State of Texas as relator and Relator individually, based on extensively detailed factual allegations that meet both 12(b)(6) and 9(b) standards.

## IV.     FACTUAL ALLEGATIONS OF THE SAC

In hospitals and other health care facilities, health care-associated infections, i.e., "health care acquired infections" ("HAIs") have become a serious concern, from quality of care, safety and cost standpoints. HAIs are infections that people acquire while they are receiving treatment for medical or surgical conditions in a health care setting. HAIs can be acquired anywhere health care is delivered. HAIs acquired in a hospital are among the leading causes of death in the United States. HAIs alone are responsible for $28 billion to $33 billion in potentially preventable health care expenditures annually. Scientific evidence has shown that certain types of HAIs can be drastically reduced to save lives and avoid excess costs with proper care and attention.[1] [SAC, ¶¶ 3-6].

---

[1]     NATIONAL ACTION PLAN TO PREVENT HEALTH CARE-ASSOCIATED INFECTIONS: ROAD MAP TO ELIMINATION APRIL 2013, https://health.gov/sites/default/files/2019-09/hai-action-plan-executive-summary.pdf

RELATOR GINGER KING'S OPPOSITION TO DEFENDANT
HARRIS HEALTH SYSTEMS' MOTION TO DISMISS – Page 4

A.    HACRP

HACRP is a Medicare "pay-for-performance" program that supports the CMS' long-standing effort to link Medicare payments to healthcare quality in the inpatient hospital setting. Section 1886(p) of the Social Security Act established the statutory requirements for the HACRP. Beginning with Fiscal Year (FY) 2015 patient discharges (i.e., effective October 1, 2014), the HACRP requires the Secretary of Health and Human Services ("HHS") to adjust payments to hospitals that rank in the worst-performing 25 percent (bottom quartile) of all subsection (d)[2] hospitals with respect to hospital-acquired condition ("HAC") quality measures. At the same, the higher performing hospitals in (top quartile) can be eligible for "incentive" payments. Hospitals with a Total HAC Score greater than the 75th percentile of all Total HAC Scores (*i.e., the hospitals in the worst-performing quartile*) will be subject to a 1 percent payment reduction in Medicare reimbursements. This payment adjustment applies to all Medicare  patient discharges based on the fiscal year (FY) between October 1  and September 30 (i.e., FY). The payment reduction occurs as an offset when CMS pays hospital claims. [SAC, ¶¶ 7-9].

To accomplish its plan to avoid penalties and even receive incentive payments, Defendant, in violation of Federal laws, CMS regulations and guidelines, knowingly (i) directed nursing staff to change diagnosis or not record the occurrence of HAPIs, (ii) recorded incorrect diagnoses codes to hide the occurrence of HAPIs, and (iii) failed to accurately record or code HAPIs, all to circumvent HACRP. HACRP, established by 42 U.S.C. § 1395(ww)(p), is a

---

[2]    As used in 42 U.S.C. 1395ww, the term "*subsection (d) hospital*" means a hospital located in one of the fifty States or the District of Columbia *other than*—(i) a psychiatric hospital (as defined in section 1861(f)), (ii) a rehabilitation hospital (as defined by the Secretary), (iii) a hospital whose inpatients are predominantly individuals under 18 years of age, (iv) a hospital which has an average inpatient length of stay (as determined by the Secretary) of greater than 25 days.

"Medicare law" within the meaning of the Provider Form CMS-855A,[3] CMS Claim Form 1500,[4] and Cost Report UB-92,[5] making certifications and representations in such forms violations of

Medicare. [SAC, ¶ 56]. These certifications and representations, both express and implied, were false under HACRP and so violated the FCA.

B.    Underreporting HAPIs to Avoid the Penalty

As alleged in the SAC, when Defendant's nurses attempted to document HAIs properly, they were routinely asked to change documentation to reflect that a HAPI was *not* even present. As already noted as an example, Barbara Madden, Chief Nursing Officer at Defendant, asked for such a change by nurse Kristy Epley who was a wound care Registered Nurse, after a visit by Rosemarie Massey from the Texas Health and Human Services Commission - Nurse III Health Quality Section 2. [SAC, ¶ 68].

As a further example of the extent of false underreporting, on Defendant's July 2020 Quality Scorecard (which covers the period from October 2019 until May 2020), HAPI Stage 2 indicators were listed as "0", not only meeting the target but placing it in the top quartile when in fact, there were in fact 61 Stage 2 HAPIs that occurred during this very same reporting period. If Defendant had properly accounted for and reported HAPIs in the HACRP HQ System, Defendant's Total HAC Score would have placed Defendant in the lowest quartile of

---

[3]    Medicare Provider Application for Institutional Providers. This form expressly provides that Provider certifies compliance with all Medicare laws.

[4]    Fee For Service Medicare Claim Form. This form expressly provides that Provider certifies compliance with all Medicare laws.

[5]    Participating hospitals must file cost reports annually. 42 U.S.C. § 1395g; 42 C.F.R. § 413.20(b). Each year's report covers all the interim requests for reimbursement, such as the UB-92 forms used by hospitals and home health agencies, submitted during that cost reporting year. The UB-92 contains a variety of certifications that must be made if the request is to be processed, including compliance with all Medicare laws.

RELATOR GINGER KING'S OPPOSITION TO DEFENDANT
HARRIS HEALTH SYSTEMS' MOTION TO DISMISS – Page 6

all reporting hospitals, subjecting it to a one per cent (1%) reduction in Medicare

reimbursement. payments. [SAC, ¶ 56-59, Exhibit B].  The Quality Scorecard, incorporated

into the SAC as Exhibit B, is the document falsely presented by John Phillips, the hospital

President of Defendant, to its leadership team as the status of Defendant's quality markers for

FY 2021 as of July 14, 2020. Top quartile is what every organization hopes for. This is the

number of pressure injuries the organization must have to get rewarded financially through

CMS. [SAC, ¶ 7].

C.    Failure to Follow Mandated Data Collection Process

Accurate reporting is essential to the HACRP program and critically important to CMS.

As delineated in the SAC, each program year, CMS generates a Hospital-Specific Report

("HSR") for each hospital eligible for the HACRP based on data provided by the hospital. [SAC,

¶ 62]. In Defendant's case, the HSR is based on a knowingly corrupt and fraudulent data

collection and reporting process on the part of Defendant.

The HSR is a Microsoft Excel file that contains information to enable hospitals to review

the results of its operations [SAC, ¶ 63-64].  Sherri Floyd and Jeri Harlan, assistants to

Defendant's Chief Nursing Officer Barbara Madden, and Linda Scribner, Defendant's Quality

Director, filled the roles at Defendant of data collection and reporting. Specifically, as alleged in

the SAC, data on HAPIs that are Stage 2 and above are collected quarterly and placed into the

National Database of Nursing Quality Indicators ("NDNQI") by wound care nurses. This data is

collected through the following process: One day a quarter, two nurses from each department

assist wound care nurses by going from floor to floor and looking at all patients' skin. If a

pressure injury ("PI") is identified, it is reported to the wound care nurses. The wound care

nurses would then evaluate the wound. If it was a PI that was not previously known based on

charting, it would be deemed an HAI and reported by the wound care nurse. This data was input

into the NDNQI website for reporting purposes quarterly. Relator was asked to have the wound care nurses and herself input the data in April or May of each year. [SAC, ¶65].

A sample of data documentation requirements is incorporated in Exhibit C to the SAC, a printout of a computer record that is required to be completed and input into the NDNQI system. This electronic record is essential to the HACRP. The patient specific data that is required includes (i) date a PI was identified, (ii) days between admission and the HAPI, (iii) a skin assessment verified by two nurses, and (iv) notification to the attending physician. [SAC, ¶ 66]. Once a plaintiff is identified, additional information is required to be disclosed, including (i) the Braden score trends, (ii) clinical assessments, including documentation whether the patient was turned every two hours, (iii) out of bed activity, and (iv) patient level of consciousness. [*Id.*]

Defendant's failure to follow the required process was documented and illustrated in an email chain that took place on June 30, 2021 to July 1, 2022, acknowledging, at best, that "maybe half" of Defendant's pertinent staff are "properly" implementing established nursing quality indicators to avoid HAPIs. This demonstrates a lack of quality nursing resulting in HAPIs. Specifically, in response to a specific patient who was found to have five HAPIs, Kristen Epley urged several nurses that the case should be reviewed to "identify our opportunities to improvement that can make patients safer." [SAC, ¶ 67]. In response, Dawn Huggins, one of the recipients stated that *"I rounded today and went over proning. Will continue to actively round and see if positioners in place and being used properly."* In response, Kristen Epley replied. . . *"Are they being used properly?"* In response to that question, Dawn Huggins acknowledged. . . *"Maybe half of them?"* Huggins indicated that she did *"education today with them, and I will coach in real time. I did let them know that we are rounding daily, and I am reviewing for MANDATORY q 4 rounding."* Kristen Epley, aware of the necessary quality indicators, replied . .

RELATOR GINGER KING'S OPPOSITION TO DEFENDANT
HARRIS HEALTH SYSTEMS' MOTION TO DISMISS – Page 9

. "*Please try to enforce every 2 hours; 4 hours is way too long . . . more than likely, will not be able to decrease the HAPI rate with four.*" [*Id.*]

If HAPI rates had been reported accurately, Defendant was at risk of being penalized more than $6.76 million based on Medicare funding of at least $676 million for the period of October 1, 2019 to September 30, 2020. The results would have been the same or similar for each fiscal year since the inception of the HACRP in fiscal year 2015, representing penalties of at least $33 million. [SAC, ¶ 62-67, Exhibit D].

      D.      <u>Defendant Failed to Provide Required Supervision of Nursing Care</u>

Defendant is required, as a mandated standard of care, that its registered nurses document, supervise and evaluate their nursing care for each patient. 42 CFR 482.23(b)(3). [SAC, ¶ 69]. In addition to federal requirements, Texas law requires such documentation to include the status and assessment of the patient's condition, nursing care rendered to the patient, physician orders on medications and treatments, and the response and evaluation of the patient when an intervention has been made. Texas Administrative Code, Title 22, Part II, Section 217.11(1)(D) and 133.41(o)(D)(2). [SAC, ¶ 70].

Relator became aware, during periods in 2020, that there was no documentation by nursing staff for treatment plans recommended by wound care nurses. This included failure to document necessary measures such as (1) turning and repositioning every two hours as required, (2) use of foam, Aquacel AG or iodosorb to treat pressure injuries. [SAC, ¶ 71].

Based directly on Relator's complaints, both CMS and representatives of the State of Texas investigated Relator's claims and confirmed Defendant's deficiencies and lack of compliance. Copies of the CMS-2567 Statement of Deficiencies and Texas Health and Human Services Statement of Deficiencies are incorporated into the SAC. Specifically, and contrary to

Defendant's claim in the MTD, the Texas investigative report states Relator's complaints were "*substantiated with deficiency cited*" [SAC, ¶ 72, Exh. E, page 1 of 6]. As far back as 2018, the State of Texas, in a previous state visit in June 2018, found that Defendant's nurses were not turning their patients and also not providing required discharge instructions to patients in regards to wound care. [*Id.* at ¶ 72].  Determined to improve compliance, Relator began working with nursing leadership and wound care nurses regarding documentation of care to patients. This attempt to strive for compliance led to the backlash that resulted in her termination.  [*Id.*].

> E.    Defendant Knowingly Disregarded the Lack of Proper Care

Senior management of Defendant was aware of its significant noncompliance with HACRP for many years. In and prior to 2020, John Phillips, President of Defendant and Dr. Leslie Cler, Defendant's Chief Medical Officer, and Amy Mabry, the ICU Director of Nursing, were aware of the lack of nursing care regarding HAPIs, specifically in Defendant's Intensive Care Unit ("ICU"). Dr. Cler was informed of the problem by Dr. Maryam Raza, a wound care physician at Defendant, and despite being informed, refused and failed to intervene. [SAC, ¶¶ 73-74]. In addition to senior management, during the same time period, Barbara Madden, Linda Scribner and Pamala Gessling, Director of Nursing for Women's Services, Women's Service and Urology/GYN medical unit, were also fully aware of the lack of nursing care that resulted in HAPIs and failed to take any meaningful action. [SAC, ¶¶ 73-74].

V.    STANDARD OF REVIEW

A.    The Rule 8(a) and 12(b)(6) Standard

Rule 12(b)(6) allows dismissal of a claim if a plaintiff fails "to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). A motion to dismiss under Rule 12(b)(6) is "viewed with disfavor and is rarely granted." *United States ex rel. Tucker v. Christus Health*, No. 09-11819, 2012 U.S. Dist. LEXIS 151906, 8-9 (S.D. Tex. Oct. 23, 2012) (Atlas, J.) (qui tam case, *citing Harrington v. State Farm Fire & Cas. Co.*, 563 F.3d 141, 147 (5th Cir. 2009).

Rule 12(b)(6) must be read in conjunction with Rule 8(a), which requires "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009). To withstand a Rule 12(b)(6) motion, a complaint must simply contain "enough facts to state a claim to relief that is plausible on its face"—legal conclusions alone are insufficient. *Twombly*, 550 U.S. at 570. The "pleading standard Rule 8 announces does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *United States ex rel. King v. Univ. of Texas Health Science Center-Houston*, 907 F. Supp. 2d 846, 849 (S.D. Tex. 2012) (Rosenthal, J.) (qui tam case quoting *Iqbal*, 556 U.S. at 678). The complaint must be liberally construed in favor of the plaintiff, and when there are well-pleaded factual allegations, courts should presume they are true, even if doubtful—only then may the court determine whether they "plausibly give rise to entitlement to relief." *United States ex rel. Tucker*, 2012 U.S. Dist. LEXIS 151906 at 8-9.

B.    The Rule 9(b) Standard

Complaints filed under the False Claims Act must also meet the heightened pleading standard of Federal Rule of Civil Procedure 9(b), which provides: "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." *United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 185 (5th Cir. 2009) (citing Fed. R. Civ. P. 9(b)). Rule 9(b) requires "that a plaintiff set forth the 'who, what, when, where, and how' of the alleged fraud." *United States ex rel. Steury v. Cardinal Health, Inc.*, 625 F.3d 262, 266 (5th Cir. 2010). "Because the linchpin of an FCA claim is a false claim, the time, place and contents of the false representations, as well as the identity of the person making the misrepresentation and what that person obtained thereby must be stated in a complaint alleging violation of the FCA in order to satisfy Rule 9(b)." *United States ex rel. Rafizadeh v. Continental Common, Inc.*, 553 F.3d 869, 873 (5th Cir. 2008) (internal quotations and citation omitted).

For FCA claims, Rule 9(b) must be applied in a "context-specific and flexible" manner. *United States ex rel. Grubbs*, 565 F.3d at 190. "It is adequate to allege that a false claim was knowingly presented regardless of its exact amount; the contents of the bill are less significant because a complaint need not allege that the Government relied on or was damaged by the false claim." *Id*. at 189. The complaint may "survive by alleging particular details of a scheme to submit false claims  paired with reliable indicia that leads to a strong inference that claims were actually submitted." *Id*. at 190.

VI.    ARGUMENT

A.    Relator's First Through Fourth Causes
      are Adequately Plead Under Rule 9(b)

In alleging fraud or mistake, a party must state with particularity the circumstances constituting such. *United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 185 (5th Cir. 2009) (citing Fed. R. Civ. P. 9(b)). Rule 9(b) requires "that a plaintiff set forth the 'who, what, when, where, and how' of the alleged fraud." *United States ex rel. Steury v. Cardinal Health, Inc.*, 625 F.3d 262, 266 (5th Cir. 2010).  As reflected in Section IV, a review of the SAC clearly demonstrates that 9(b) has been met.

B.    Relator's First Through Fourth and
      Sixth Causes Are Adequate as Plausible

The allegations of the SAC regarding Defendant's fraud under the HACRP are extensively detailed, including background on the HACRP programs. The FCA is "intended to reach all types of fraud, without qualification, that might result in financial loss to the government." *United States v. Neifert-White*, 390 U.S. 228, 232 (1968). Relator alleges that Defendant violated the FCA by causing the submission of false claims[6] in violation of 31 U.S.C. § 3729(a)(1)(A), (B) and (G). Section (A) of the FCA imposes liability on any person who *"Knowingly presents or causes to be presented a false or fraudulent claim for payment or approval"*;  31 U.S.C.§ 3729(a)(1)(A), as amended May 20, 2009.[7]

A false certification (express or implied) establishes the "falsity" of a claim under the

---

[6]    The FCA defines a "claim" to include any request or demand, whether under contract or otherwise, for money or property which is made to a contractor, grantee, or other recipient if the United States Government provides any portion of the money or property which is requested or demanded, or if the Government will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested.

[7]    The Fraud Enforcement Recovery Act of 2009, Pub.L. No. 111-21, § 4, 123 Stat. 1616 (2009), modified and renumbered the subsections of § 3729(a) ("FERA").

RELATOR GINGER KING'S OPPOSITION TO DEFENDANT
HARRIS HEALTH SYSTEMS' MOTION TO DISMISS – Page 14

FCA.  This was emphasized by Congress in the 1986 Amendments to the FCA, stating "each and every claim submitted under a contract, loan guarantee or other agreement which was originally obtained by means of false statements or other corrupt and fraudulent conduct, or in violation of any statute or appropriate regulation, constitutes a false claim."  S.Rep. No. 99-345 at 9 (1986), reprinted in 1986 U.S.C.C.A.M. 5266, 5274. Section 3729(a)(1)(A) requires only that a claimant present a 'false or fraudulent claim for payment or approval' without the additional element of a 'false record or statement.'  *Id.* Thus § 3729(a)(1)(A) allows a relator to bring a claim based on a defendant submitting a claim for government funds without explicitly making a false statement.

The FCA, 31 U.S.C. § 3729(a)(1)(B) makes "knowingly" making,  using, or causing to be used or made, a false record or statement to get a false or fraudulent claim paid or approved by the government a violation of federal law for which the United States may recover three times the amount of the damages the government sustains and a civil monetary penalty of between $10,781 and $21,563.00 per claim.

A legally false FCA claim is based on a 'false certification' theory of liability." *Id.*  A claim is legally false when the claimant knowingly falsely certifies that it has complied with a statute or regulation which is material to the government's decision whether to make payment for the goods or services.

Within the theory of false certification, there are two further categories: express and implied false certification.  A defendant violates the FCA under express false certification when, in conjunction with a request for federal funds, it certifies that it is in compliance with regulations that are requirements for payment. An FCA violation occurs under implied false certification when a party submits a claim for payment that makes specific representations about

RELATOR GINGER KING'S OPPOSITION TO DEFENDANT
HARRIS HEALTH SYSTEMS' MOTION TO DISMISS – Page 15

the goods or services provided, but knowingly fails to disclose the noncompliance with a statutory, regulatory, or a contractual requirement. In these circumstances, liability may attach if the omission renders those representations misleading.

HACRP, as described previously, is a "Medicare law" within the meaning of Provider Form CMS-855A, CMS Claim Form 1500, and Cost Report UB-92, containing certifications and representations under the HACRP. [SAC, ¶ 56].

The FCA, 31 U.S.C. § 3729(a)(1)(G), makes anyone who knowingly makes, uses or caused to be made or used, a false record or statement, material to an *obligation to pay or transmit* money or property to the government, or knowingly conceals or knowingly and improperly avoids or decreases an *obligation to pay or transmit money to the government* liable for three times the amount of the damages the Government sustains and a civil monetary penalty of between $10,781.00 and $21,563.00. The plain text of the FCA's reverse false claims provision is clear: any individual who "knowingly conceals or knowingly and improperly avoids or decreases an *obligation to pay or transmit* money or property to the Government" may be subject to liability.

At this pleading stage, when all well-pled facts must be taken as true, along with reasonable inferences that the Court can infer from such well-pled facts, it is clear the SAC meets Relator's burden of pleading false certification.

The false statements contained in Defendants' required reporting of HACs under the HACRP constituted a record or statement that was knowingly false and inaccurate and was, in part, designed to conceal and improperly avoid its obligation to correct HACRP filings as described herein, including obligations to return the reimbursement funds that were received as a result of the avoidance of the HARCP penalty. Any overpayment retained by a person after

the deadline for reporting and returning the overpayment is an obligation. 31 U.S.C. § 3729(a)(1).

In sum, Relator's claims of violation of Section 3729 of the FCA are eminently plausible and so not subject to dismissal.

C.    Relator's First through Fourth Counts are Adequate as to Materiality

As Defendant recognizes (MTD at 4-5), Relator alleges violations of Section 3729 of the FCA. Defendant identifies the elements of the claims as being a fraudulent course of conduct, requisite scienter, materiality and payment of a claim. *Id*. The Supreme Court, in *Universal Health Servs., Inc. v. United States ex rel. Escobar,* 136 S. Ct. 1989, 1996, 195 L. Ed. 2d 348 (2016), reaffirmed that the proper test for determining materiality in FCA cases is whether the conduct at issue has "a natural tendency to influence, or [is] capable of influencing, the payment or receipt of money or property." 136 S. Ct. at 2002 (citing 31 U.S.C. § 3729(b)(4); *Neder v. United States*, 527 U.S. 1, 16 (1999); *Kungys v. United States*, 485 U.S. 759, 770 (1988)). This approach is consistent with the statutory text of the FCA, which was amended in 2009 to expressly incorporate the "natural tendency" test, thereby rejecting a more onerous "outcome materiality" standard that some courts had adopted. See Pub. L. No. 111-21 at § 4 (2009) (Fraud Enforcement and Recovery Act of 2009 ("FERA")).

The Supreme Court in *Escobar* identified a variety of factors bearing on this holistic assessment, including whether:

- whether the requirement violated is a condition of payment,

- whether the requirement violated is significant or "minor or insubstantial,"

- whether the violation goes to the "'essence of the bargain,'" and

- how the Government has treated similar violations when it had "actual knowledge" of them.

Under the FCA, a misrepresentation or fraudulent course of conduct is accordingly material if it has "a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4). As such, an FCA materiality analysis "look[s] to the effect on the likely or actual behavior of the recipient of the alleged misrepresentation." *Escobar*, 136 S. Ct. at 2002 (quoting 26 R. Lord, Williston on Contracts § 69:12 (4th ed. 2003) ("Williston")). It asks whether "a reasonable person would attach importance to" the misrepresented fact in making his or her payment decision. *See id*. at 2003 & n.5 (quoting Williston, § 69:12). "No one factor is dispositive, and [the] inquiry is holistic." *United States ex rel. Lemon v. Nurses to Go, Inc.*, 924 F.3d at 161. *United States ex rel. Campbell v. Kic Dev., LLC*, 2019 U.S. Dist. LEXIS 218588 (W.D. Tex. 2019).

As set forth in Section IV, the express and implied both certifications by Defendant in HACRP filings directly impacted the administration of HACRP as to Defendant, avoiding any question of materiality.

As an aspect of materiality, Defendant attempts to argue the COVID-19 pandemic was to blame for its noncompliance with the HACRP. MTD at 8 . . . *a majority of the allegations relate to ...the COVID-19 Pandemic*). The allegations in the SAC, however, clearly references a time period beginning well prior to the pandemic. Moreover, there were no "*new and unfamiliar protocols*" instituted during the pandemic for preventing injuries from bed sores and other pressure injuries. Defendant's claim of relaxed reporting requirements by CMS during the pandemic are thus irrelevant to the substance of the MTD because Defendant continued to report under the HACRP, thereby actually "gaming the system" it claimed was inoperative in order to

receive the bonus. [*See* SAC ¶¶ 7, 55]. Defendant similarly attempts to argue that a CMS Final Rule published in September 2020 gives it a "get of the jail free card" that absolves it of any liability. MTD at 16-17. This is simply not the case. Even though that rule relaxed reporting requirements in some cases, CMS found that nearly all hospitals (95.3 percent) reported the required data for 2019 by the submission deadline, which reflects care provided prior to January 27, 2020, the start of the emergency declaration for COVID-19. Therefore, CMS determined that it would be appropriate to include data that were optionally reported by hospitals for the fourth quarter of CY 2019 in calculating hospitals' Total HAC Scores, used to determine the worst-performing 25 percent of hospitals on HAC performance for assessing the one percent HACRP penalty. This determination is consistent with the policy stated in a previous March 27, 2020 guidance memo. 85 FR 54820. Moreover, the September 2020 rule did not affect reporting state requirements. At best, Defendant's argument based on that rule bears on damages and not materiality or plausibility.

D.    Relator's First Through Fourth Causes Are Adequate to Plead Scienter

Defendant claims in its MTD that Relator's claims lack the necessary scienter. "Knowingly" or scienter, under the FCA means the defendant (1) had actual knowledge that the claim is false; or (2) acted with deliberate ignorance of the truth or falsity of the claims; or (3) acted with reckless disregard of the truth or false of the other claim. 31 U.S.C. § 3729(b)(1)(A)(1-3) and Section 2729(b)(1)(B).

In this case, as reflected in Section IV, the SAC adequately pled that Defendant is guilty of all three levels of culpability. The SAC alleges that Defendant knew of its noncompliance and thus acted knowingly for purposes of the FCA. As Defendant acknowledges (MTD at 20-21), general allegations alone are sufficient. Federal Rule 9(b); *Smith v. Carolina Med Center*, 274 F.

Supp. 3d 300, 321 (E.D. Pa. 217) (FCA malice, intent, knowledge and other conditions of a person's mind "may be alleged generally under Rule 9(b)"). As reflected, however, in Section IV, the SAC alleges numerous facts corroborating these general allegations. [SAC, ¶¶ 9, 10, 11, 15, 16, 21, 67, 68, and 73-76].

       E.      <u>Relator's Fifth Count is Not Subject to Being Dismissed</u>

Relator's fifth count in her SAC, for violation by Defendant of Section 161.134 of the Texas Health & Safety Code, is not properly dismissed. Defendant seeks dismissal on the ground that the date of Relator's assertion of that claim in her SAC is beyond the 180-day statute of limitations specified in Section 161.134. Motion at 21-22. However, Defendant fatally ignores the relation lack doctrine of Rule 15(c) of the Federal Rules of Civil Procedure, allowing an otherwise untimely claim when an amendment arose out of the conduct, transaction or occurrence set out in the original pleading, in this case the same conduct, transaction or occurrence supporting Relator's claim under Section 3730(h) of the FCA, actually asserted together with Relator's Section 161.134 claim by Relator in Relator's First Amended Complaint ("FAC") filed on January 14, 2022. Based on the allegations of the FAC and SAC, there is no question that both the Section 161.134 and Section 3730 claims arise out of the same conduct, transaction or occurrence.[8] *Davis v. United Health Services*, 2020 WL 33597 (W.D. Tex. 2020),

---

[8]      Reinforcing the inappropriateness of dismissal of Relator's Section 161.134 claim under the 180-day statute of limitations invoked by Defendant, Defendant had actual notice of the Section 161.134 claim as early as 133 days after Relator's August 3, 2019 termination of employment by Defendant. That is so because the claim was first asserted in Relator's original petition in Dallas County District Court, Cause No. DC-20-19374 in the 192nd District Court of Dallas County, Texas, filed on January 4, 2021 (copy attached). Indeed, the Dallas County suit was pending even after Relator's Complaint in this action was filed and only nonsuited on January 31, 2022 after Relator's Section 161.134 claim was reasserted in Relator's FAC in this action on January 14, 2022. Defendant unaccountably fails to acknowledge it had timely notice of Relator's Section 161.134 claim in the Texas state court suit, instead suggesting falsely it had notice of the Section 161.134 claim only for the first time in the SAC, not even in the FAC. Such ample notice of Relator's claim under Section 161.134 well prior to notice by Relator of the claim under the Section 3730(h) of the FCA and Section 161.134 in this action means that Defendant simply does not lack the timely knowledge of the claim, as asserted in part, demanded by the 180-day statute of limitations within Section 161.134.

RELATOR GINGER KING'S OPPOSITION TO DEFENDANT
<u>HARRIS HEALTH SYSTEMS' MOTION TO DISMISS</u> – Page 20

does not, as Defendant insists, support dismissal of Relator's Section 161.134 claim. <u>Davis</u> involved nothing more than a delayed initial filing of a Section 161.134 claim beyond the 180-day deadline after the plaintiff's termination. Because there was no prior "original pleading," there was no any consideration of the relation back doctrine under Rule 15(c), much less consideration of prior timely assertion of the very Section 161.134 claim at issue referred to in footnote 1.

      F.      Relator's Fourth and Sixth Counts
              <u>Are Not Properly Subject to Dismissal</u>

Relator's Fourth and Sixth counts in her SAC, for violation of Section 3730(h) and the corresponding anti-retaliation provision of the TMFPA, are not properly subject to dismissal. Defendant correctly recognizes the elements of a claim under both statutes (Motion at 23), but claims that Relator's allegations in each regard are lacking—that Relator did not engage in protected conduct, that Defendant did not have notice of such protected conduct, or that even if Relator did engage in protected conduct to Defendant's knowledge, Relator did not suffer actionable retaliation in the form of an ultimate employment action. Defendant is misguided in each case in its assessment of the sufficiency of Relator's allegations in the SAC.

      1.      <u>Protected Conduct</u>

Defendant's argument that Relator's allegations in her SAC do not establish protected conduct is contradicted by Defendant's own recognition of Relator's critical allegation in paragraph 25 of the SAC—that she complained of Medicare and Medicaid fraud to Defendant's risk manager, Sherri Floyd (Motion at 22).[9] That allegation makes ridiculous Defendant's legal argument for the insufficiency of such an allegation since the two FCA decisions on the point,

---

[9]      In paragraphs 55 and Endnote 24, Relator alleges multiple fraudulent practices by Defendant.

cited by Defendant, and the decisions upon which those decisions themselves relied (id. at 22-23), all simply require that internal complaints refer to illegality or fraud, and Relator's specific reference to "Medicare fraud" easily fits the bill. *Robert v. Bell Helicopter Textron, Inc.,* 32 F.3d 948, 951 (5th Cir. 1994); *Jameson v. Fluor Federal Solutions, LLC*, 2017 WL 3215289, *5 (N.D. Tex. 2017).[10]

Notwithstanding Defendant's acknowledgment that Relator specifically alleged Relator complained of Medicare and Medicaid fraud, Defendant, incredibly, argues that what Relator was complaining about was mere reporting discrepancies. MTD at 23. But, again, Defendant admits that Relator alleged she complained about fraud, not mere reporting discrepancies. Similarly, based on the false premise that Relator complained about mere reporting discrepancies, Defendant argues that Relator was not engaging in protected conduct because reporting discrepancies was part of her job. But if the premise is false, because Relator was complaining about fraud, not mere reporting discrepancies, there is no argument that her complaint was inadequate because reporting discrepancies was part of her job. This action is thus distinguishable from *Sealed Appellant I v. Sealed Appellant I*, 156 F. App'x 630, 634-35 (5th Cir. 2005), cited by Defendant, in which, as the court noted, the plaintiff did not even inform his supervisors that he was concerned about fraud. Id. An analogy to a complaint about construction methods offered by Defendant in which there was no reference to illegality or fraud is equally inapt.

It is ultimately simply ludicrous for Defendant to argue that Relator was complaining of something less than fraud when Relator herself, by Defendant's own admission, claims to have

---

[10]    Defendant does not suggest that the protected conduct analysis under the TMFPA is any different than that under the FCA.

RELATOR GINGER KING'S OPPOSITION TO DEFENDANT
HARRIS HEALTH SYSTEMS' MOTION TO DISMISS – Page 22

specifically alerted Defendant's risk manager of Medicare fraud. Motion at 24. Relator

adequately alleged protected conduct under the FCA and TMFPA.

    2.    Notice of Protected Conduct

Defendant contends that Relator did not plead facts that Defendant was on notice of

fraud. Motion at 24. But to support a claim of retaliation under Section 3730(h), Defendant must

simply be on notice of protected conduct, not notice of fraud itself. If, as Relator alleges by

Defendant's admission, Defendant's risk manager was on notice of Defendant's complaints of

Medicare and Medicaid fraud as such, Defendant can hardly disclaim required knowledge of

protected conduct. It does no good for Defendant to cite *Guerrero v. Total Renal Care, Inc.*,

2012 WL 899228, (W.D. Tex. 2012), *United States ex rel. Gonzales v. Fresenius Medical Care*

*N. America*, 748 F. Supp. 95 (W.D. Tex. 2010) or *Robertson v. Bell Textron, Inc.*, 32 F.3d 953

(5th Cir. 2003), because, as Relator recognizes, those decisions simply require notice of

protected conduct in the form of notice of an employee investigating fraud, as was the case based

on Relator's statement to Defendant's risk manager. Accordingly, based on the allegations of the

SAC, Defendant had the required notice of Relator's protected conduct under the FCA and

TMFPA.

    3.    No Actionable Employment Action

Defendant's final argument for dismissal of Relator's Section 3730(h) claim seems to be

that Relator cannot allege an ultimate employment action to make retaliation against her

actionable. But actionable retaliation is not the same as actionable discrimination, only the latter

of which requires an ultimate employment action. *Burlington N. & Sante Fe Co. v. White*, 548

U.S. 53, 57-68 (2006) (standard of retaliation is materially adverse action as opposed to ultimate

employment decision requirement for discrimination); *Jones McNamara v. Holzer Health*

RELATOR GINGER KING'S OPPOSITION TO DEFENDANT
HARRIS HEALTH SYSTEMS' MOTION TO DISMISS – Page 23

*System*, 630 F. App'x 394, 397-98 (6th Cir. 2015) (FCA retaliation claims viewed similarly to other employment retaliation claims). In any case, an FCA claim may be based on constructive discharge and the constructive discharge alleged by Relator is, as a legal matter, properly treated as an ultimately employment action the product of retaliation. *United States ex rel. MacKillop v. Grand Canyon Education, Inc.*, 2022 WL 4084444 (D. Mass. 2022) (constructive discharge claim under 31 U.S.C. § 3730(h)); *Smith v. LHC Group, Inc.*, 2018 WL 1136072 (6th Cir. 2018) (same); *Dieckman v. Care Convention of Cincinnati, LLC*, 2018 WL 6675491 (S.D. Ohio) (same); *Byrd v. National Health Corp.*, 2019 WL 403964 (E.D. Tenn. 2019) (same); *Bourne v. Provider Services Holdings, LLC*, 2019 WL 2010596 (S.D. Ohio 2019) (same). Defendant is thus wrong in suggesting that Relator cannot assert a constructive discharge claim because a final warning preceding it, which led to it, was itself not an ultimate employment action.

Defendant's effort to obtain dismissal of Relator's Section 3730(h) claim and corresponding claim under the TMFPA is so thoroughly wanting as to be frivolous in all of its three components.

WHEREFORE, Relator prays that this Court deny Defendant's motion to dismiss and grant her any other relief to which she is entitled.

Respectfully submitted,

KILGORE & KILGORE, PLLC
By:      Robert E. Goodman, Jr.
Texas Bar ID 08158100
Kilgore & Kilgore, PLLC
3141 Hood Street, Suite 500
Dallas, Texas 75219
214-379-0823
214-379-0840 (fax)
Email: reg@kilgorelaw.com

BEGELMAN & ORLOW, P.C.
By:     Marc M. Orlow
        Ross Begelman
411 Route 70 East, Suite 245
Cherry Hill, New Jersey 08034
(856) 428-6020
Email: marc.orlow@begelmanorlow.com
Email: ross.beglman@begelman.orlow.com

ATTORNEYS FOR RELATOR

CERTIFICATE OF SERVICE

This is to certify that a copy of the foregoing was served by this Court's electronic filing system and/or by email to all counsel of record this 27th day of June 2023:

Marc B. Collier
Norton Rose Fulbright US, LLP
98 San Jacinto Boulevard, Suite 1100
Austin, Texas 78701
marc.collier@nortonrosefulbright.com
512-474-5201
512-536-4598 (fax)

Jeff J. Wurzburg
Norton Rose Fulbright US, LLP
111 W. Houston Street, Suite 1800
San Antonio, Texas 78205
jeff.wurzburg@nortonrosefulbright.com
210-270-9338
210-270-7205 (fax)

/s/ Robert E. Goodman, Jr.
Robert E. Goodman, Jr.