UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| GINGER KING ex rel. UNITED STATES OF AMERICA and THE STATE OF TEXAS, | § § § § | |
| Relator, | § § | |
| v. | § § | CIVIL ACTION NO. 3:21-CV-1923-B |
| METHODIST HOSPITAL OF DALLAS, d/b/a METHODIST HEALTHCARE SYSTEMS, and d/b/a METHODIST DALLAS MEDICAL CENTER, | § § § § § | |
| Defendant. | § § § | |

## MEMORANDUM OPINION AND ORDER

Before the Court is Defendant Methodist Hospital of Dallas d/b/a Methodist Health Systems ("Methodist")'s Motion to Dismiss the Second Amended *Qui Tam* Complaint ("SAC") pursuant to Federal Rules of Civil Procedure 12(b)(6) and 9(b) (Doc 39). Having reviewed the SAC, the parties' briefs, and the record, the Court **GRANTS** in part and **DENIES** in part Methodist's Motion.

## I.

## FACTUAL BACKGROUND

Relator Ginger King filed this *qui tam* suit against her former employer, Methodist, after learning of activity that she alleges constitutes Medicare and Medicaid fraud under the False Claims Act ("FCA") and the Texas Medicaid Fraud Prevention Act ("TMFPA"). Doc. 28, SAC, ¶¶ 95–108. Additionally, Relator alleges that Methodist retaliated against her under state and federal law when

she notified those in leadership of the alleged fraud. *Id.* ¶¶ 109–110. Relator's FCA and TMFPA fraud claims all concern a type of injury known as a "Hospital Acquired Pressure Infection" ("HAPI"). *Id.* ¶ 33. In its Motion to Dismiss, Methodist argues that the SAC is insufficient under the requisite pleading standards. *See* Doc. 39, Mot., 1–2.

At the crux of her fraud claims, Relator alleges Methodist's recording of HAPIs is what wrongly entitled it to funding under a Medicare program known as the Hospital Acquired Conditions Reduction Program ("HACRP"). Doc. 28, SAC, ¶¶ 9–11. HAPIs factor into HACRP's scoring system known as the "Total HAC Score," which is calculated by Centers for Medicare and Medicaid Services ("CMS") for every participating hospital. *See id.* ¶¶ 6-7. The SAC raises claims that Methodist "knowingly" engaged in fraud in the following three ways: 1) false certifications accompanying data Methodist submitted to CMS for its Total HAC Score ranking, 2) false recording of HAPI data as to HACRP reporting, and 3) false claims obtained through unreturned reimbursements or "obligations." *Id.* ¶¶ 8–11, 77–105. But for the falsified certifications and reporting, Relator contends, Methodist's Total HAC Score would have put the hospital in the bottom twenty-five percentile of hospitals receiving federal funds. *Id.* ¶ 13. Being within the bottom quartile of hospitals results in a 1% reduction in Medicare and Medicaid funding. *Id.* Relator does not provide Methodist's rank amongst hospitals for any time between the 2016–2020 time period. As to the last method, Relator alleges that from 2016 to 2020 Methodist falsified its HAPIs count and submitted reimbursement claims for remedial care that was "non-existent, grossly deficient, materially substandard and/or worthless." *Id.* ¶¶ 11–12.

The Court first reviews the role HAPIs play in CMS's calculation of Total HAC Scores, and then explains the effect that COVID-19 had on Total HAC Score data between 2019 and 2020—the period of Relator's tenure at Methodist.

A.     *The Hospital Acquired Conditions Reduction Program ("HACRP")*

CMS created HACRP to incentivize hospitals to prevent several varieties of patient injuries that occur post-admission. *Id.* ¶¶ 6, 40, 49–50. Under HACRP, each hospital has its patient data[1] categorized and calculated into a Total HAC Score. *Id.* ¶¶ 6, 49–52. Akin to an annual auditing program, HACRP uses hospitals' data and self-reporting to determine whether hospitals should continue to receive the Medicare and Medicaid funds they seek. *Id.* ¶¶ 52. Once Total HAC Scores are calculated across hospitals, the bottom quartile of scoring hospitals face a 1% Medicare payment reduction as to "Medicare fee-for-service discharges" for the following fiscal year. *Id.* ¶¶ 8, 52–53. The top quartile of scoring hospitals can be eligible for incentive payments. *Id.* ¶ 7.

The Total HAC Score is the result of a complex set of calculations. It includes an equal weighting of certain data to ensure one metric does not have an outsized impact on the Total HAC Score. The Total HAC Score is based on six "measures of hospital-acquired conditions." *Id.* ¶ 53; *see also Hospital-Acquired Condition Reduction Program*, CMS, https://www.cms.gov/medicare/payment/prospective-payment-systems/acute-inpatient-pps/hospital-acquired-condition-reduction-program-hacrp (Oct. 10, 2023, 7:24 AM). A hospital's Total HAC Score is calculated by taking the equally weighted average of the six measures of healthcare-associated patient conditions. *Id.* One of these six measures is Patient Safety and Adverse Events Composite ("PSI 90"). Doc. 28, SAC, ¶ 53. And PSI

---

[1] Maryland hospitals are exempt from this program.

90 itself is a composite measure that is made up of *ten* component measures. Doc. 39, Mot., 15; *see Patient Safety Indicators (PSI) Overview*, CMS, https://qualitynet.cms.gov/inpatient/measures/psi.

One of PSI 90's components is a HAPI. *Id.* (referring to PSI 03 as pressure injuries). A HAPI refers to a new pressure injury that has occurred after a patient is admitted into a hospital's care. Doc. 28, SAC, ¶ 33. There are four stages of severity for HAPIs, with Stage 4 reflecting the most severe HAPI. *Id.* ¶ 38. The four stages of HAPIs encapsulate a pressure injury that either damages skin or creates a pressure ulcers that opens up the skin. *Id.* ¶¶ 34, 38.

PSI 90 has nine other components that are not relevant to this case. However, an important twist to the PSI 90 measure is that it does not treat the ten component measures equally; instead, the ten components are weighted differently. *See* HACRP FAQ Fiscal Year 2020, CMS, https://qualitynet.cms.gov/files/64e7a6d29631f9001cc7e0ec?filename=FY_2024_HACRP_FAQ.pdf, 10 (July 2019). The ten differently weighted components are then statistically represented by "winsorized *z*-scores"—scores that remove the noise from any extreme, outlying data.[2] *Id.* ("The Winsorization process reduces the impact of [each component's] extreme or outlying measure results and preserves hospitals' relative results"); HACRP Scoring Methodology, CMS, https://qualitynet.cms.gov/inpatient/hac/methodology. The PSI 90 is calculated based on hospitals' medical claims and the data within them. *See id* at 12.

---

[2] Specifically, the winsorized *z*-score is "equal to the difference between a hospital's Winsorized measure result and the mean of Winsorized measure results calculated across all subsection (d) hospitals, divided by the standard deviation of Winsorized measure results calculated across all subsection (d) hospitals." https://www.cms.gov/files/document/fy-2024-hac-reduction-program-fact-sheet.pdf. Negative Winsorized *z*-scores indicate better performance. Positive Winsorized *z*-scores indicate worse performance.

Like the PSI 90, the remaining five measures of the Total HAC Score[3] are also focused on healthcare associated infections, such as urinary tract infections and bloodstream infections. *Id.* at 6–7; SAC ¶ 53. These measures' data is abstracted from patient charts. *Id.*

Each May, hospitals report their data to CMS for the fourth quarter of the prior year. *See e.g.,* HACRP FAQ Fiscal Year 2020, CMS, https://qualitynet.cms.gov/files/64e7a6d29631f9001cc7e0ec?filename=FY_2024_HACRP_FAQ.pdf, 7 (July 2019). Thereafter, CMS uses each hospital's data to calculate its Total HAC Score, which CMS previews to the hospitals. Doc. 28, SAC ¶ 62–63. Hospitals then have thirty days to review, submit questions, or request corrections to their scoring. *Id.* ¶ 54. Following the review process, CMS publicly reports hospitals' finalized Total HAC Scores. *Id.*

1.   HACRP Data Collection Is Paused Due to COVID-19

The worldwide pandemic caused by COVID-19 impacted CMS's measurement of hospitals' Total HAC Scores, and PSI 90, for 2019 and 2020. *See Final Rule Regarding Quality Medicare Programs FY 2023,* 87 Fed. Reg. 45299 (Aug. 10, 2022) (to be codified at 42 C.F.R. pts. 412, 413, 482, 485, 495). As a preliminary matter, the HACRP reporting and Total HAC scores in 2019 and 2020 relied on data from prior years. As a result, the HAPIs going into those Total HAC Scores were derived using data from prior years. For fiscal year 2020, CMS calculated the PSI 90 based on data from July 2016 through June 2018. *Id.* For fiscal year 2019, CMS calculated the PSI 90 based on data from October 2015 through June 2017. *Id.*; *see also* Hospital-Acquired Condition Reduction

---

[3] However, not all hospitals will even have all five measures occurring in their facilities. [inferred from website] Thus, a HAC Score could be calculated based on fewer than six of the above-delineated measures. Relator has not alleged whether MDMC's Total HAC Score relies on all six measures or fewer measures.

Program Measures, CMS, https://qualitynet.cms.gov/inpatient/hac/measures (reflecting all PSI 90 "performance periods for the FY 2015 to FY 2024 program years"). In effect, CMS's PSI 90 calculation for 2019 and 2020 did not rely on any recorded HAPIs in those years.

According to CMS, HAPI data collected from the fourth quarter ("Q4") of 2019 and the fiscal year ("FY") of 2020 also have a limited or no role in reporting for subsequent years. On March 22, 2022, CMS announced that all HACRP reporting for Q4 2019 would be "optional." *CMS Announces Relief for Clinicians, Providers, Hospitals and Facilities Participating in Quality Reporting Programs in Response to COVID-19*, CMS, (Mar. 22, 2020), https://www.cms.gov/newsroom/press-releases/cms-announces-relief-clinicians-providers-hospitals-and-facilities-participating-quality-reporting. This gave hospitals two options: (i) opt out of using Q4 2019 data, which would result in a future Total HAC Score calculated based, in part, on data from January 1, 2019 to September 30, 2019, or (ii) submit data from October 1, 2019 to December 31, 2019, which would result in the Q4 data being used towards a future Total HAC Score. *See id.* In the same announcement, hospitals were also informed that CMS would not be counting their performance from January 1, 2020 to June 30, 2020 "for performance or payment programs" in order "to reduce the data collection and reporting burden on providers responding to the COVID-19 pandemic." *Id.* Ultimately, CMS chose to exclude all 2020 claims data from calculations in the HACRP, including the Total HAC Score. *See* 87 Fed. Reg. 45299, 45305; *see also* Hospital-Acquired Condition Reduction Program Measures, CMS, n. a, https://qualitynet.cms.gov/inpatient/hac/measure.

B.    *The SAC's Factual Allegations*

The SAC contains the following non-conclusory factual allegations, which the Court accepts as true. In the absence of any distinction between facts underpinning Relator's federal and state claims, the Court divides the allegations between Relator's fraud and retaliation claims.

1.    Allegations Concerning Fraud

Relator's tenure at Methodist began in May 2019 and ended on August 3, 2020. *Id.* ¶¶ 14, 25. She was an Acute Care Services Director and, from February 2020 to August 2020, she also served as Methodist's Interim Director of Education. *Id.* ¶ 14. While Methodist has four hospitals that provide in-patient and out-patient medical services, *id.* ¶¶ 1, 28, Methodist Dallas Medical Center ("MDMC") is the only hospital relevant to Relator's claims, *see id.* ¶¶ 15–25, 68, 73–76.[4] Approximately 80% of Methodist's patients qualify for Medicare or Medicaid. *Id.* ¶ 16.

During Relator's employment with Methodist, she reported all incidents of HAPIs to Methodist's risk manager and quality director. *Id.* ¶ 16. According to Relator, Methodist was required to report "[s]ome of the severe, but not all of the, incidents of HAPIs within MDMC," to the Texas Department of State Health Services and to CMS. *Id.* Between October 2019 to July 2020, there were 64 HAPIs.[5] *Id.* ¶ 17. Of those 64 HAPIs, 11 occurred between October and December

---

[4] The Court identifies no factual allegations made as to Methodist's three other hospitals: MMMC, MCMC, and MRMC. Doc. 28, SAC, ¶ 28. The only non-conclusory allegations are made as to MDMC.

[5] Relator asserts that the alleged practices at MDMC "are occurring system wide at [Methodist] and have been ongoing for several years." *Id.* ¶ 2. However, without any other factual allegations to support this conclusion and considering she is referring to years preceding her tenure at MDMC, the Court does not take Relator's allegation as true. *Twombly*, 550 U.S. at 555 (2007).

2019.[6] *Id.* ¶ 19. In comparison, Relator emphasizes, there were 18 HAPIs recorded for the entirety of 2018.[7] *Id.* ¶ 17.

Beginning in January 2020, Relator notified Methodist's ICU Director, Chief Nursing Officer, risk manager, and safety director of the increasing HAPIs. *Id.* ¶¶ 15, 19. In April or May 2020, Relator and other wound-care nurses were responsible for reporting HAPIs that were Stage 2 or above in the National Database of Nursing Quality Indicator ("NDNQI"). *Id.* ¶ 65. On an unknown date, the Chief Nursing Officer asked a wound care registered nurse to change documentation to "reflect that a HAPI was not even present." *Id.* ¶ 68.

Methodist's reporting in the HACRP CMS Hospital Quality Reporting (HQR) System contained incorrect HAPI counts. *Id.* ¶ 84. Like all participating hospitals, Methodist makes express certifications in its HACRP filings and submissions as well as in its "CMS Forms 885A, 1500 and UB-92." *Id.* Methodist's Total HAC Score calculated by CMS is received and downloaded by MDMC's Chief Nursing Officer's assistants, "and possibly . . . [the] Quality Director." *Id.* ¶ 64.

2.    Allegations as to Retaliation

Beginning in mid-2019, Relator observed an increasing number of HAPIs occurring in MDMC's intensive care unit ("ICU"). *Id.* ¶ 15. She began reporting the increasing HAPIs at the beginning of 2020. *Id.* She learned that ICU nurses were not "turning patients regularly," and their failure to follow protocol "accelerated beginning in March 2020." *Id.* ¶¶ 15, 20. Relator also "became

---

[6] Relator is inconsistent in alleging the number of HAPIs that occurred in these months. Citing to an internal Methodist document that reflected "Stage 2 *and above*" HAPIs during October and December 2019, Relator alleges that "there were in fact 61 stage 2 HAPI[s]" during this time period. Doc. 28, SAC, ¶ 58.

[7] Relator alleges nothing about the propriety of HAPI recordings in 2018, therefore, the Court deems recordings from 2018 to serves only as a point of comparison.

aware that some patients were . . . dropped onto the floor." *Id.* ¶ 15. Between January and July 2020, there were "as many as 120" HAPIs at MDMC. *Id.* ¶ 19. In response, Relator regularly communicated the increasing HAPIs she observed and recommended ways to remedy the rise to MDMC's Chief Nursing Officer, ICU Director, risk manager, and safety director. *Id.* ¶¶ 19, 21. At some point in May 2020, Methodist's ICU Director accused Relator of being responsible for a patient "telemetry issue." *Id.* ¶ 22. On May 18, 2020, however, Methodist's Chief Nursing Officer stated Relator's work performance was "so excellent it made peers feel inadequate." *Id.* ¶ 23.

On some date prior to July 23, 2020, Relator reported to the Chief Nursing Officer that Relator believed Methodist was in violation of Chapter 161 of Texas Health and Safety Code because she believed Methodist had submitted claims for Medicare reimbursement that were unjustified. *Id.* ¶¶ 10, 12, 24. Relator also reported it was possible Methodist violated a rule of "another agency other than a state regulatory agency." *Id.* ¶ 24.

On July 23, 2020, Methodist's Chief Nursing Officer and ICU Director gave Relator a final warning in connection with the patient telemetry issue. *Id.* ¶ 25. Relator contested the warning and responded that she believed the warning was made in retaliation to her continuing complaints concerning increasing HAPIs. *Id.* On July 24, 2020, Relator met again with Methodist's Chief Nursing Officer, who suggested that Relator's complaints concerning HAPIs in the ICU were "sabotaging" the ICU Director. *Id.* With Methodist's HR Director present, the Chief Nursing Officer also advised Relator to resign or be terminated because she was no longer a good fit for the senior nursing team. *Id.* On July 27, 2020, and on one other instance, Methodist's ICU Director told Relator "to stay in her lane." *Id.*

Prior to July 31, 2020, Relator complained to MDMC's risk manager that Relator believed MDMC has committed "Medicare and Medicaid fraud." *Id.* ¶ 25. Also at some point prior to July 31, 2020, Relator was ostracized by other members of Methodist's nursing leadership, she was excluded from communications and meetings held by Methodist's Chief Nursing Officer, and she faced "other retaliatory conduct" from a Director of obstetrical services. *Id.* ¶¶, 21, 25.

On July 31, 2020, Relator reported to Methodist "the adverse conduct . . . with respect to care of Medicare patients" at MDMC.  *Id.* ¶ 25. Relator also reported to "state regulatory agencies" Methodist's "adverse conduct . . . with respect to patients generally." *Id.* That same day, Methodist's Chief Nursing Officer and HR Director told Relator it was best to "sever ties," giving her "the choice to resign or be fired." *Id.* On August 3, 2020, Relator wrote a resignation letter that referenced the threat of termination she faced and her desire to continuing working for Methodist. *Id.*

## II.

## PROCEDURAL BACKGROUND

A.     *Relator Files a State Claim against Defendants*

On December 31, 2020, Relator filed a state action against Methodist, in which she asserted a retaliation claim under § 161.134 of the Texas Health and Safety Code. Doc. 46-1, Original Pet., ¶ 19. In her state court petition, Relator also asserted that, depending on future discovery, she intended to file claims of "retaliatory termination, or other claims in violation of the federal False Claims Act and Texas Medicaid Fraud Prevention Act." *Id.* at ¶ 70. The underlying factual allegations for retaliation in the state action mirror those in the SAC.

B.      *Relator Files Federal Qui Tam Action Against Defendants*

On August 18, 2021, Relator filed the Original Complaint in this *qui tam* suit. Doc. 2, Compl. On January 14, 2022, before Methodist was notified of the suit, Relator amended her complaint. Doc. 12, Am. Compl. On February 2, 2023, the Government notified the Court that it would not be intervening in the matter. Doc. 26, Notice. On February 15, 2023, Relator filed a Second Amended Complaint, which was later served on Methodist. Doc. 28, SAC; Doc. 33, Summons Executed. Thereafter, Methodist moved to dismiss with prejudice under Rules 12(b)(6) and 9(b). Doc. 39, Mot. Dismiss. The Motion is now ripe for consideration.

### III.

### LEGAL STANDARD

A.      *Rule 12(b)(6) Motion to Dismiss*

Federal Rule of Civil Procedure 12(b)(6) authorizes dismissal for failure to state a claim upon which relief may be granted. FED. R. CIV. P. 12(b)(6). When analyzing Rule 12(b)(6) motions, courts generally consider "the complaint, its proper attachments, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Wolcott, M.D., P.A. v. Sebelius*, 635 F.3d 757, 763 (5th Cir. 2011). During this review, well-pled facts must be viewed "in the light most favorable to the plaintiffs." *Sonnier v. State Farm Mut. Auto Ins. Co.*, 509 F.3d 673, 675 (5th Cir. 2007). Courts, however, are not "bound to accept as true a legal conclusion couched as a factual allegation." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)).

Rule 12(b)(6) motions turn on whether the complaint contains "enough facts to state a claim to relief that is plausible on its face." *Id.* at 570. Facially plausible complaints "allege more than labels

and conclusions[;] . . . [the] factual allegations must be enough to raise a right to relief above the speculative level." *Jabaco, Inc. v. Harrah's Operating Co.*, 587 F.3d 314, 318 (5th Cir. 2009) (citing *Twombly*, 550 U.S. at 555).

B.    *Rule 9(b)'s Heightened Pleading Requirements*

The SAC's fraud claims, asserted through the FCA and TMFPA, must also meet Rule 9(b)'s particularity requirements. *U.S. ex rel. Willard v. Humana Health Plan of Texas Inc.*, 336 F.3d 375, 384 (5th Cir. 2003); *U.S. ex. rel. Foster v. Bristol-Myers Squibb Co.*, 587 F. Supp. 2d 805, 827 (E.D. Tex. 2008) (applying Rule 9(b) to TMFPA claim). Thus, Relator must plead "with particularity the circumstances" surrounding the fraudulent claims alleged. FED. R. CIV. P. 9(b). This, "at minimum," means Relator must "'set forth the who, what, when, where, and how of'" Methodist's unlawful conduct. *U.S. ex rel. Steury v. Cardinal Health, Inc.*, 625 F.3d 262, 266 (5th Cir. 2010) (quoting *U.S. ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 903 (5th Cir.1997)). Failure to comply with Rule 9(b)'s requirements authorizes the Court to dismiss the pleadings as it would for failure to state a claim under Rule 12(b)(6). *Lovelace v. Software Spectrum, Inc.*, 78 F.3d 1015, 1017 (5th Cir. 1996).

## IV.

## ANALYSIS

Relator brings three counts of fraud under the FCA and one count of fraud under the TMFPA.[8] As a preliminary matter, the Court finds there is not a sufficient basis in the SAC to

---

[8] Count Four of the SAC appears to recycle language from another complaint: Relator complains of Methodist reporting to Texas's "Medicaid" program falsities "regarding their pharmaceutical products." *See* Doc. 28, SAC ¶¶ 107–08. Reading the SAC's allegations in the light most favorable to Relator, the Court

support Relator's allegations of fraud at MDMC or Methodist that allegedly occurred before Relator began working for Methodist in 2019. Specifically, while the SAC states that Methodist engaged in Medicare fraud since 2016, Doc 28, SAC, ¶ 17, there are no other supporting facts alleged about this time period. Rather, Relator appears to assert that, based on her factual allegations of fraud within MDMC in 2019 and 2020, similar fraudulent activity must have occurred prior to Relator's tenure at Methodist. Such a leap is unsupported. *See Jabaco*, 587 F.3d at 318. Thus, the non-conclusory allegations concerning fraud that taken as true involve events in 2019 and 2020 only.

A.       *Counts 1–4: Fraud Under FCA and TMFPA*

All of Relator's fraud claims are subject to the heightened pleading standard under Rule 9(b). *U.S. ex rel. Williams v. McKesson Corp.*, No. 3:12-CV-0371-B, 2014 WL 3353247, at *3 (N.D. Tex. July 9, 2014) (Boyle, J.). The FCA generally requires relators to establish four elements: "(1) a false statement or fraudulent course of conduct; (2) that was made or carried out with the requisite scienter; (3) that was material; and (4) that caused the government to pay out money (i.e., that involved a claim)." *U.S. ex rel. Spicer v. Westbrook*, 751 F.3d 354, 365 (5th Cir. May 5, 2014) (citing *U.S. ex rel. Longhi v. United States*, 575 F.3d 458, 467 (5th Cir. 2009)). The TMFPA count arises out of several sections of the Texas Human Resources Code, Doc, 28, SAC, ¶¶ 106–08, however all of these sections require scienter, like the FCA claims. [9] Therefore, the Court's analysis begins with

---

reads Count Four as an attempt to assert a TMFPA claim based on MDMC's HAPI reporting for HACRP—a Medicare program.

[9] The State of Texas has filed a Statement of Interest in Response to Methodist's Motion to Dismiss, arguing that the TMFPA's scope of prohibited activity is broader than that of the FCA because the TMFPA does not expressly require the presentment of a false claim. Doc. 49, Statement, 3–5. However, the Court need not decide whether the FCA is narrower because the undersigned concludes Relator fails to meet the TMFPA's pleading standard as to other elements, including scienter.

scienter. The Court next turns to the FCA's materiality requirement, which, at the very least, applies to subsections (1), (2), and (4) of the TMFPA count. TEX. HUM. RES. CODE ANN. § 36.002(1)–(2), (4)–(5), (9). After that, the Court analyzes the asserted FCA claims under the first element and last elements. *Westbrook*, 751 F.3d at 365. Finally, the Court addresses subsections (5) and (9) of the TMFPA count.

### 1.   Scienter

Methodist moves to dismiss Relator's FCA and TMFPA claims on a number of grounds. Most fatally, Methodist establishes that the SAC does not sufficiently allege the requisite scienter. Doc. 39, Mot., 7–12. The FCA's scienter element requires (1) "actual knowledge of falsity," (2) "deliberate ignorance of the truth or falsity of the information provided," or (3) "reckless disregard of the truth or falsity of the information provided." *Longhi*, 575 F.3d at 468. The defendant must also act "with the purpose of getting a false claim paid by the Government." *U.S. ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 192 (5th Cir. 2009). Similarly, under the TMFPA, a defendant acts "knowingly" if he or she "has knowledge of the information;" "acts with conscious indifference to the truth or falsity of the information;" or "acts in reckless disregard of the truth or falsity of the information." TEX. HUM. RES. CODE ANN. § 36.0011(a). While Relator does not present a theory of scienter, the Court presumes she intended to hold Methodist vicariously liable for its employees' awareness of the rising HAPIs as alleged in the SAC.

The SAC contains no insufficient allegations to would permit the inference that Methodist actually knew, deliberately ignored, or recklessly disregarded a falsity submitted to HACRP in exchange for payment. *Longhi*, 575 F.3d at 468; *see also Grubbs*, 565 F.3d at 192. Relator learned

HAPIs were increasing in the ICU and made senior members of MDMC's nursing division aware, including the Chief Nursing Officer. Doc. 28, SAC, ¶¶ 15, 19. Additionally, Relator alleges Methodist's HACRP reporting to CMS included incorrect HAPI information. *Id.* ¶¶ 84–85. Finally, according to the SAC, the Chief Nursing Officer's assistants downloaded the Total HAC Score calculated by CMS for MDMC. *Id.* ¶ 64. These facts do not support an element of scienter under either pleading standard. There are no allegations connecting the Methodist senior members' knowledge of increasing HAPIs with *the recording or reporting of HAPIs*,[10] let alone the precise number of HAPIs reported. And the SAC does not permit the inference that the Chief Nursing Officer had knowledge of any HAPI reporting, whether correct or not, from the fact that her assistants downloaded the CMS's calculated Total HAC Score. The SAC fails to allege what the assistants did with the downloaded report or what data would be included in this report.[11]

Without any fact alleging a connection to MDMC's actual reporting to the government, the SAC does not particularly or plausibly plead any form of the required scienter. *Longhi*, 575 F.3d at 468; *see also Grubbs*, 565 F.3d at 192. Even assuming the senior leadership who learned of the increasing HAPIs from Relator did nothing, that does not establish plausible conscious indifference or recklessness as there no factual connection to a *reporting* of different HAPI figures, which they ignored or would have known about. *U.S. ex rel. Long v. GSD & M Idea City LLC*, No. 3:11-cv-1154, 2013 WL 214590 (N.D. Tex. Jan. 18, 2013) (O'Connor, J.) ("But the scienter element is not met by

---

[10] The only person ever alleged to be inputting or reporting HAPIs at MDMC is Relator. *Id.* ¶¶ 16, 65.

[11] The example report provided by Relator also does not sufficiently allege scienter. *See* Doc. 28-1, Ex. A. There are also no allegations that the Chief Nursing Officer or anyone else alleged to know of increasing HAPIs reviewed the "Discharge Level Information" or knowingly let such information be reflected incorrectly in federal or state disclosures.

allegations of 'mere negligence or even gross negligence.'") (quoting *U.S. ex rel. Farmer v. City of Houston*, 523 F.3d 333, 338 (5th Cir.2008)). Therefore, it is not plausible, let alone particular pled, from the face of the SAC that Methodist had the scienter required for Relator's fraud claims. *Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 339 (5th Cir.2008) ("The plaintiffs must set forth specific facts supporting an inference of fraud.").

### 2.   Materiality

Methodist separately contends that "the structure and design of the HACRP" and "the time period at issue" makes Relator's claims implausible. Doc. 39, Mot., 14, 17–20. A false claim is material if it has "a natural tendency to influence, or be capable of influencing, *the payment or receipt* of money or property." 31 U.S.C. § 3729(b)(4) (emphasis added); *see Longhi*, 575 F.3d at 468. Taking as true that MDMC's HAPIs increased in late 2019 into 2020, Doc. 28, SAC, ¶ 19, Relator must sufficiently allege the increase is capable of influencing MDMC's Medicare funding, not merely the Total HAC Score. Having reviewed the calculation structure of the Total HAC Score and CMS's treatment of 2019–2020 HAPI data, the Court finds that the SAC's allegations wholly fail to rise "above the speculative level." *Jabaco, Inc.*, 587 F.3d at 318. To be capable of influencing MDMC's Medicare funding is to be capable of putting MDMC in the top or bottom quartile of hospitals. Doc. 28, SAC, ¶¶ 7–8, 52–53. Relator fails to establish how it is plausible that falsely recording or reporting "some" HAPIs at MDMC could impact Methodist's Total HAC Score to shift MDMC either into the top quartile of hospitals or the bottom quartile.[12] Ultimately, it is the Total HAC

---

[12] A mathematically unexplained allegation in the SAC is that Methodist's false reporting of HAPIs was so important that it helped bring Methodist to the top quartile of Total HAC Scoring hospitals to earn "incentive payments," Doc. 28, SAC, ¶¶ 7, 55, but those same falsities were also so great that, had they been omitted, the hospital would plummet to the bottom quartile of hospitals, *id.* ¶ 11.

Score structure as well as CMS's altered requirements for 2019 and 2020 data that render any such recordings immaterial on their face.

As a threshold matter, the Court must assume a few facts before delving into the calculation of the Total HAC Score as applied to the SAC. Relator never alleges MDMC's Total HAC Score ranking for any year, rendering her allegations as to MDMC's relative ranking incomplete. *See id.* Nonetheless, the Court considers whether the allegations permit the inference that misreporting HAPIs is capable of impacting the Total HAC Score in some meaningful way. First, the Court looks at Relator's allegations as to HAPI data in Q4 2019, namely that there were 11 HAPIs between October and December 2019.[13] however, the Court assumes all eleven HAPIs needed to be reported. *See Sonnier*, 509 F.3d at 675. Relator emphasizes that in 2018, MDMC had eighteen total HAPIs, *id.* ¶ 17, yielding a quarterly average of four and a half HAPIs. Of course, eleven HAPIs occurring in one quarter is greater than four and a half in the prior year. But such a reference point does not mean that eleven HAPIs in one quarter would meaningfully impact the Total HAC Score.

The Total HAC Score is based on six, equally weighted measures. Doc. 28, SAC, ¶ 53. Of those six measures, the PSI 90 is the only one that uses HAPI data. *Id.* The PSI 90 in turn represents an average calculation of ten measures, each of which is given a different weight. *See* HACRP FAQ Fiscal                      Year                      2024,                      CMS,                      6–7, https://qualitynet.cms.gov/files/64e7a6d29631f9001cc7e0ec?filename=FY_2024_HACRP_FAQ.

---

[13] Even taking as true that there were eleven HAPIs in the final quarter of 2019, Doc. 28, SAC, ¶ 19, the SAC does not allege whether all eleven were required to be reported. *Cf. id.* ¶ 65 (describing quarterly data collection of HAPIs that were "Stage 2 and above"). Viewing the facts in the light most favorable to Relator,

pdf (Aug. 2023). And, when looking to the relative weighting, HAPIs are in the middle of the pack. *See* HACRP FAQ Fiscal Year 2020, CMS, https://qualitynet.cms.gov/files/64e7a6d29631f9001cc7e0ec?filename=FY_2024_HACRP_FAQ. pdf, 10 (July 2019). Moreover, each of the weighted figures is ultimately represented by a z-score that "limit[s] outlier measure results" to "preserve hospitals' relative results. *See id.* As a result, assuming the eleven HAPIs in Q4 2019 constitute an extreme divergence, the PSI 90 formula would mollify the impact of such raw data. The scoring structure as a whole indicates that HAPIs have a mathematically minor role in the Total HAC Score. Finally, the calculations in a Total HAC Score are derived from approximately two *years* of data. *See* Hospital-Acquired Condition Reduction Program Measures, CMS, https://qualitynet.cms.gov/inpatient/hac/measures (reflecting all PSI 90 "performance periods for the FY 2015 to FY 2024 program years"). For example, the HACRP's FY 2021 scoring relied on data from July 1, 2017 to June 30, 2019 to calculate the PSI 90. *Id.* The Court therefore finds that HAPI data for approximately one quarter would be even less mathematically significant to a hospital's Total HAC Score.

Taking as true that eleven incidents of HAPIs were not accurately reported to CMS, it is not plausible that the inaccuracy as to those eleven HAPIs would change MDMC's Total HAC Score in any meaningful way, let alone place MDMC in the top[14] or bottom percentile of ranking hospitals. The mathematically minor role of HAPIs in a Total HAC Score is not overcome by any other facts alleged in the SAC. *See* 31 U.S.C. § 3729(b)(4). For example, there are no factual allegations as to the other nine weighted components of the PSI 90 nor the five other equally weighted measures of

---

[14] Further, even if a hospital if in the top quartile of performers that only makes it "eligible" for an incentive program rather than automatically entitled to any payment. Doc. 28, SAC, ¶ 7.

the Total HAC Score that would explain how increasing HAPIs alone would have a pronounced impact of MDMC's Total HAC Score. Applying the dearth of facts before it to the scoring structure, the Court concludes that Relator fails to plausibly establish materiality based on any reporting data from 2019.

Next, as to MDMC's HAPIs in 2020, Relator alleges there were "as many as 120 [in] the entirety of 2020 prior to July 31, 2020." Doc. 28, SAC, ¶ 19. However, due to the COVID-19 pandemic, CMS has excluded all 2020 HAPI data from HACRP calculations. Doc. 39, Mot. 16–17; *see also CMS Announces Relief for Clinicians, Providers, Hospitals and Facilities Participating in Quality Reporting Programs in Response to COVID-19*, CMS, Mar. 22, 2020, https://www.cms.gov/newsroom/press-releases/cms-announces-relief-clinicians-providers-hospitals-and-facilities-participating-quality-reporting ("CMS will not count data from January 1, 2020 through June 30, 2020 (Q1-Q2) for performance or payment programs. Data does not need to be submitted to CMS for this time period."); 87 Fed. Reg. 48780, 49127 (Aug. 10, 2022) (to be codified at C.F.R. pts 412–413, 482, 485, 495) (confirming the "suppression of the third and fourth quarters of CY 2020" of HAPI data "for purposes of scoring and payment adjustments").[15]

Methodist suggests that the HACRP for FY 2022 relied on data from July 1, 2018 – June 30, 2020, Doc. 39, Mot., 17. However, the CMS publications concerning FY 2022 PSI 90 all indicate that this measure was based on data from July 1, 2018 through December 31, 2019. *See* Fiscal Year 2022 Fact Sheet: Hospital-Acquired Condition (HAC) Reduction Program, CMS, ("In response to

---

[15] Although the Final Rule explains that hospitals would still be required to submit Q3 and Q4 2020 data, and such data would be used for public reporting purposes, the data would not be used for Total HAC Calculations. 87 Fed. Reg. at 49121. CMS explains in its final rule that its analysis of PSI 90 "suggested that comparability of performance on the measure have also been impacted by" COVID-19. *Id.* at 49123.

the COVID-19 public health emergency, CMS is excluding Calendar Year 2020 data from all program calculations for the HAC Reduction Program."); 87 Fed. Reg. at 49120–21 (illustrating prior CMS guidance directed FY 2022 PSI 90 to be based on 2018–19 data). Accordingly, even if it were true that 120 HAPIs occurred at MDMC between January 1, 2020 – July 31, 2020, none of this data would have even been used towards providing MDMC with federal funding.

In sum, the Court finds that the alleged rise in HAPIs between 2019 and 2020 could not have plausibly influenced MDMC's Total HAC Score, let alone its Medicare funding through HACRP. *See* 31 U.S.C. § 3729(b)(4). Relator's FCA claims and TMFPA claim under §§ 36.002(1), (2), and (4), therefore, cannot proceed on this basis.

### 3.   False Claim

Notwithstanding the above, the Court finds Methodist correctly identifies another flaw in Relator's SAC: failure to plead a false claim under the FCA. Courts typically analyze the FCA's first element by asking whether a "legally" or "factually" false claim for payment has been established. *U.S. ex rel. Wall v. Vista Hospice Care, Inc.*, 778 F. Supp. 2d 709, 717 (N.D. Tex. 2011) (Lynn, J.) (citation omitted). A *factually* false claim is one in which "the prospective payee has submitted an inaccurate description of the goods or services provided, or a request for reimbursement for goods or services never provided." *Id.* at 718 (citation omitted). A *legally* false claim, on the other hand, usually involves a prospective payee certifying "compliance with a statute or regulation as a condition to government payment" while knowing that the payee is not in compliance. *Id.* at 717–18 (citing *U.S. ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 902 (5th Cir. 1997)).

Even if a relator cannot allege a specific false claim, at the very least, a relator must plead an alleged fraudulent scheme to overcome a motion to dismiss. *Grubbs*, 565 F.3d at 191; *see also U.S. ex rel. Parikh v. Citizens Med. Ctr.*, 977 F. Supp. 2d 654, 671 (S.D. Tex. 2013) ("But though the *Grubbs* court relaxed the standard for pleading presentment of false claims by holding it sufficient for a relator to merely plead 'reliable indicia' that claims were submitted, it did not relax the pleading requirements for alleging the existence of the more crucial element—the scheme."); *U.S. ex rel. Wismer v. Branch Banking & Tr. Co.*, No. 3:12-CV-1894-B, 2013 WL 5989312, at *7 (N.D. Tex. Nov. 12, 2013) (Boyle, J.) ("But as other courts have since explained, the relaxed claim submission standard in *Grubbs* is limited to instances in which the '*particular* details of a scheme' are alleged, because the precise 'contents of [the] false claim' are not always significant.") (internal citation and quotation omitted).

The SAC alleges that Methodist executed fraudulent claims by falsely certifying that its reporting pursuant to HACRP was accurate, knowingly recording or having nurses record incorrect HAPI counts, and submitting claims for reimbursement for services that were not performed or grossly deficient. Doc. 28, SAC, ¶¶ 10–12, 56. The Court concludes the Relator has not particularly pled any false claims nor the circumstances surrounding a scheme to submit false or fraudulent information.

### i.    *False Certifications*

Relator alleges that Methodist made false statements within its HACRP reports, which are subject to express certifications. *Id.* ¶ 84. In response, Methodist argues that Relator's assertions do not sufficiently allege a *legally* false claim as she has not shown how Medicare funding is conditioned

on a hospital's HACRP certification. Mot. 39, Mot., 18–19; *U.S. ex rel. Willard v. Humana Health Plan of Tex. Inc.*, 336 F.3d 375, 382–83 (5th Cir.2003) (affirming district court's dismissal where relator failed to establish government conditioned payment on certification of compliance). According to Methodist, the insufficiency of Relator's claim is apparent from the very fact that Methodist continued to receive governmental funding, without sanction or penalty, after governmental investigations arising from this suit. Doc. 39, Mot., 18–20. Indeed, while Relator alleges that hospitals' HACRP filings and related form submissions are subject to "express certifications," Doc. 28, SAC, ¶ 84, she does not allege that Methodist's reporting obligation and accompanying certification were "condition[ed] to government payment." *U.S. ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 902 (5th Cir. 1997). The only reasonably inference that the Court can glean from the SAC is that 1% of a hospital's Medicare funding is "conditional" if it is in danger of being at the bottom quartile of hospitals. Doc. 28, SAC, ¶¶ 7–8, 52–53. However, there are no well pled facts indicating Methodist's ranking let alone that it was in danger of being at or near the bottom quartile of hospitals. CMS's records suggest there was no danger at all as MDMC was approximately in the 65th percentile of scoring hospitals in 2020. *See Fiscal Year (FY) 2020 HAC Reduction Program Resources*, CMS, https://qualitynet.cms.gov/inpatient/hac/resources#tab5.

Finally, while Relator alleges that each claim for reimbursement is certified by Methodist as "reasonable and necessary," Doc. 28, SAC, ¶ 86, there are no other supporting facts pled in conjunction with this claim. Therefore, there is not a sufficiently pled *legally* false claim in the SAC.

ii.     *False Recording of HAPI Diagnosis Codes*

Methodist contends that Relator has not particularly pled fraud by recording or having nurses record inaccurate HAPIs. In response, Relator appears to rely on her allegation that at some unknown time, the MDMC's Chief Nursing Officer directed a nurse to change documentation to reflect that a single HAPI had not occurred. Doc. 46, Resp., 3 (citing SAC ¶ 68). Even assuming this was a recordable HAPI and that the nurse changed documentation in this instance, the SAC does not provide facts to permit the inference that the unrecorded HAPI gave Methodist anything of value in return, *i.e.*, through a federal reimbursement. *Grubbs*, 565 F.3d at 190 (explaining relator's obligation to provide "particular details of a scheme to submit *false claims* paired with reliable indicia that lead to a strong inference that *claims were actually submitted*" (emphases added)). There is no connection, for example, between the changed HAPI, and a conditional government payment. *Id.*; *Wall*, 778 F. Supp. 2d at 717. Thus, the SAC fails to plausibly establish a legally or factually false claim made in connection to this incident. *U.S. ex rel. Stephenson v. Archer Western Contractors, LLC*, 548 F. App'x 135, 139 (5th Cir. 2013) (unpublished) (quoting *Thompson*, 125 F.3d at 903).

Relator's allegation that nurses were "routinely" told to change HAPI codes does not change the Court's conclusion. While the Fifth Circuit notes that the "time, place, contents and identity" of a false claim is not "a straitjacket for Rule 9(b)," a scheme of fraudulent claims cannot be particularly pled with one incompletely pled incident. *See Grubbs*, 565 F.3d at 186.

iii.     *False Claims*

The SAC alleges that "some . . . but not all of the incidents of HAPIs within MDMC" needed to be reported to Texas agencies and to CMS but were not. *See* Doc. 28, SAC, ¶ 16. Methodist

contends such an allegation fails to "identify a single claim to the government that was false," or any instances in which "claims that didn't properly reflect a HAPI" were submitted for payment. Doc. 39, Mot., 10. Preliminarily, simply alleging that "some" severe HAPIs should have been reported in state and federal disclosures, but were not, fails to meet Rule 9(b)'s particularity requirement. *See Grubbs*, 565 F.3d at 190 ("Rule 9(b)'s objectives [include] ensuring the complaint provides defendants with fair notice of the plaintiffs' claims, protects defendants from harm to their reputation and goodwill, reduces the number of strike suits, and prevents plaintiffs from filing baseless claims then attempting to discover unknown wrongs.").

Other factual allegations are similarly unconnected to a conclusion of false claims. Relator alleges that she entered data for Stage 2 or higher HAPIs for a national nursing database in April or May 2020, Doc. 28, SAC, ¶ 65, and this data "is essential" to the HACRP, *id.* ¶ 66. However, the SAC fails to allege how such data "is essential" to the HACRP. Relator does not establish, and the Court cannot speculate, whether the data is used to provide some benefit to MDMC. Most critically, there is no allegation of false claims arising out of the data that Relator reported to the nursing database. *Grubbs*, 565 F.3d at 190. In short, the SAC contains insufficient factual allegations particularizing the "who, what when, where, and how" behind any alleged falsity or falsely submitted claim. Doc. 39, Mot., 8; s*ee U.S. ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 903 (5th Cir. 1997) (citation omitted).

### 4.  TMFPA: §§ 36.002(5) and (9)

Relator's state claim theories raised under §§ 36.002(5) and (9) are entirely unsupported by the SAC. TEX. HUM. RES. CODE ANN. § 36.002(5), (9). A claim under § 36.002(9) requires a relator

to plead with particularity a conspiracy as well as the "overt acts taken in furtherance of the conspiracy." *United States v. Dental Health Programs, Inc.*, No. 3:18-CV-00463-E, 2020 WL 3064712, at *15 (N.D. Tex. June 8, 2020) (Ramirez, M.J.) (citation omitted). Particularly pleading a conspiracy requires allegations of "'particular circumstances' from which agreement may be 'naturally inferred.'" *Id.* (quoting *Grubbs*, 565 F.3d at 193). Here, the Relator has not alleged any agreement nor facts permitting the inference of an agreement between anyone employed by Methodist. *See U.S. ex rel. Headen v. Abundant Life Therapeutic Servs. Tex., LLC*, No. H-18-773, 2019 WL 1930274, at *10 (S.D. Tex. Apr. 30, 2019) (dismissing conspiracy claim for failure to allege agreement between people or entities). Similarly the SAC does not allege any facts to support a claim under subsection (5), which requires particular facts concerning a health service conditioned on a "gift" or "payment" from HACRP. TEX. HUM. RES. CODE ANN. § 36.002(5). While Relator generally alleges that Methodist made false reports "to earn incentives under the HACRP," Doc. 28, SAC, ¶¶ 11, 55, there are no other facts to support her conclusion.

In sum, there are multiple deficiencies in the asserted fraud claims under the FCA and TMFPA. Not only are the claims insufficiently pled under the applicable pleading standards, but they are also foreclosed by the factual allegations underpinning them. CMS never utilized hospitals' FY 2020 data for HACRP; additionally, any Q4 2019 HAPI data voluntarily submitted is insurmountably insignificant to the calculation of the Total HAC Score, whose calculation relies on approximately two *years* worth of data and whose PSI 90 is a composite measure of *ten* differently weighted, *winsorized z-scores*. Any incorrect data knowingly submitted for HACRP would only ever be

a false claim if it hinged on government funding. But only the bottom quartile of hospitals will face a 1% reduction in funding; in 2020 MDMC was ranked roughly at the 65th percentile of hospitals.[16]

The futility of trying to assert fraud based on underreported HAPIs leads the Court to conclude that these claims must be dismissed with prejudice. *See Legate v. Livingston*, 822 F.3d 207, 211 (5th Cir. 2016). For the foregoing reasons, Methodist' Motion is **GRANTED** as to Counts One through Four.

B.      *Counts 5–6: Retaliation*

Relator's state and federal retaliation claims concern her allegations that she was forced to resign and "ostracized" by MDMC nursing staff for internally reporting Methodist's violations of the Texas Health and Safety Code and violations of "another agency other than a state regulatory agency." Doc. 28, SAC, ¶ 24. Every claim is subject to the pleading standard under Rule 8. *See U.S. ex rel. Bias v. Tangipahoa Par. Sch. Bd.*, 816 F.3d 315, 325–27 (5th Cir. 2016) (applying Rule 8 standard to claim under 31 U.S.C. § 3730(h)(1)); *Guerrero v. Total Renal Care*, Inc., No. EP-11-CV-449-KC, 2012 WL 899228, at *3 (W.D. Tex. Mar. 12, 2012) ("[B]ecause claims under § 3730(h), at their core, address retaliation issues and not fraud, Rule 8 should govern"); *see Sebastiani v. Bexar Cnty. Hosp. Dist.*, No. SA-20-CV-01093-OLG, 2022 WL 20618536, at *3, 7 (W.D. Tex. Aug. 2, 2022) (applying standard to claim under Texas Health & Safety Code §§ 161.134).

---

[16] *See Fiscal Year (FY) 2020 HAC Reduction Program Resources*, CMS, https://qualitynet.cms.gov/inpatient/hac/resources#tab5. The Court takes judicial notice of this publicly available dataset as it is directly relevant to Relator's theory of recovery. *Sebelius*, 635 F.3d at 763.

1.      Retaliation Under FCA

To state an FCA retaliation claim, Relator must allege: "(1) she engaged in a protected activity; (2) her employer knew she engaged in the protected activity; and (3) she was discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of the protected activity." *Dental Health Programs, Inc.*, 2020 WL 3064712, at *16.

Relator sufficiently alleges that she engaged in a protected activity for the purposes of an FCA retaliation claim. "To qualify as protected activity under the whistleblower provision, the activity must be 'in furtherance of' uncovering fraud or potential fraud against the Government." *U.S., ex rel. Johnson v. Kaner Med. Grp., P.A.*, 641 F. App'x 391, 395 (5th Cir. 2016). According to Relator, she reported multiple times to her superiors that she believed the HAPI count was increasing, and that she believed Methodist was engaged in the false submission of claims by not accurately recording this increase. Doc. 28, SAC, ¶¶ 24–25. At least one of Relator's complaints asserted Medicare fraud and her belief that such conduct could be violating a rule of "another agency other than a state regulatory agency." *Id.*

Methodist contends that "Relator's communications should be characterized as reporting discrepancies, not fraud." Doc. 39, Mot. Dismiss, 23. Additionally, Methodist faults Relator for imprecision in her exact words, as alleged in the SAC, to Methodist's employees. *Id.* Since Relator's complaints regarding HAPIs did not contain the words "illegal" or *qui tam*, Methodist argues her retaliation claim is inadequately pled. *Id.* This argument is overly formalistic, especially in the light of the Fifth Circuit's explanation that a retaliation claim may proceed where a whistleblower

"express[es] concerns about possible fraud to [her] employers." *Robertson v. Bell Helicopter Textron,
Inc.*, 32 F.3d 948, 951 (5th Cir. 1994). Indeed, Methodist acknowledges the SAC's allegation that
Relator reported her beliefs of "Medicare and Medicaid fraud." Doc. 39, Mot., 22–23. Viewing the
allegations in the SAC in the light most favorable to Relator, the Court finds she expressed concern
about possible fraud in connection with a federal program. *Cf. U.S. ex rel. Johnson v. Raytheon Co.*,
395 F. Supp.3d 791, 798 (N.D. Tex. 2019) (Fitzwater, J.) (explaining internal complaint to employer
may be deemed "protected" if it raises concerns about fraud).

The second element of a retaliation claim may be "satisfied based on allegations that the
employee complained directly to her supervisors." *U.S. ex rel. George v. Boston Sci. Corp.*, 864 F.
Supp.2d 597, 608 (S.D. Tex. 2012). According to the SAC, the Chief Nursing Officer is a supervisor
to whom that Relator repeatedly reported and voiced concerns. Doc. 28, SAC, ¶¶ 19, 21, 23–25.
The Chief Nursing Officer is also one of two people who is alleged to have forced Relator to resign.
*Id.* ¶¶ 23–25. Based on the pleadings, Methodist's HR Director and Chief Nursing Officer were also
aware that Relator, a senior nursing employee, believed that a measure used for a Medicare program—
HAPIs—was rising without remedy. *Id.* ¶¶ 16, 19, 25. Methodist's risk manager was also on notice
this same employee believed MDMC to be committing "Medicare and Medicaid fraud." *Id.* ¶ 25.
The Court, therefore, finds there to be sufficient factual allegations to properly plead the Chief
Nursing Officer was Relator's supervisor and that Methodist knew about Relator's protected activity.
*Id.* ¶ 24; *see George*, 864 F. Supp.2d at 608.

Finally, the SAC alleges sufficient facts to plausibly establish the third element of this claim.
Under the repeated threat of being fired, Relator was excluded from regularly working with

Methodist's nursing leadership and from meetings held by the Chief Nursing Officer. Doc. 28, SAC, ¶ 25. She was told to "stay in her lane" and that she was "no longer . . . a good fit for the senior director nursing team." *Id.* The Relator was also forced to resign because Methodist found she was no longer a good fit for the senior nursing team a few months after she was nominated by MDMC nurses for a nursing excellence award, which she received. *Id.* ¶ 18. Moreover, although the Chief Nursing Officer advised Relator to resign or face termination, two months earlier that same individual told Relator she was "so excellent it made peers feel inadequate." *Id.* ¶¶ 23, 25. After Relator provided a report of HAPIs to the Chief Nursing Officer and ICU Director, she was given "a final warning" on a patient telemetry issue that had been raised once before to her. *Id.* ¶ 25. At this stage of the litigation, such allegations are sufficient to state an FCA fraud claim. *Dental Health Programs, Inc.*, 2020 WL 3064712, at *16; *Johnson*, 395 F. Supp. 3d at 798.

### 2.   Retaliation Under Texas Health and Safety Code § 161.134

Relator's claim under Texas Health and Safety Code § 161.134[17] arises out of the same facts as her FCA-based claim. A relator must plausibly allege five elements: "(1) [s]he was an employee of a hospital; (2) [s]he reported a violation of law; (3) to a supervisor or facility administrator; (4) the report was made in good faith; and (5) [s]he was suspended, terminated, disciplined, or otherwise discriminated against." *Sebastiani*, 2022 WL 20618536, at *7 (citing *Janaki v. CH Wilkinson Physician*

---

[17] While Methodist raises an affirmative defense of untimeliness, Doc. 39, Mot., 21–22, Relator has shown that she brought this state claim against Methodist in state court within the 180-day statute of limitations period. Doc. 46, Reply, 20 n. 8. Further, the state action was only nonsuited upon Relator's filing a First Amended Complaint ("FAC") in this case. *Id.* Thus, the Court deems Relator's claim as timely. *See generally Burnett v. N.Y. Cent. R. Co.*, 380 U.S. 424 (1965) (holding as timely action brought in state court, dismissed and brought in federal court eight days later but more than three years after action accrued). The Court also determines the claim as pled in the SAC relates back to the claim as pled in the FAC. FED. R. CIV. P. 15(C).

*Network*, 624 S.W.3d 624, 628 (Tex. App.—Corpus Christi-Edinburgh 2021, no pet.). This claim also requires causation: "'the employee's protected conduct must be such that, without it, the employer's prohibited conduct would not have occurred when it did.'" *Id.* (quoting *Texas Dept. of Human Servs. v. Hinds*, 904 S.W.2d 629, 633, 636 (Tex. 1995).

Viewing the SAC in the light most favorable to Relator, the Court finds she has stated a claim under § 161.134. During the course of her employment at Methodist, Relator reported to the Chief Nursing Officer that Relator believed Methodist was in violation of Chapter 161 of the Texas Health and Safety Code because she believed Methodist to be submitting claims for reimbursement that were unjustified. Doc. 28, SAC, ¶ 24. As the Court has found, the Chief Nursing Officer is adequately alleged to be Relator's supervisor. The first three elements are thereby sufficiently alleged. *See Sebastiani*, 2022 WL 20618536, at *7. In satisfaction of the fourth element, the SAC permits the inference that Relator's reporting was made in good faith, and Methodist fails to meet its burden showing otherwise. While Methodist asserts that Relator is an "apparently disgruntled" former employee, Doc. 39, Mot., 1, it does not argue Relator's complaints were made in bad faith. As to the fifth element, the Court finds that being given a choice between resigning or being terminated falls within the catch-all category of discrimination. *See Sebastiani*, 2022 WL 20618536, at *7.

As discussed earlier in this opinion, Relator plausibly alleges causation. She asserts her forced resignation was prompted by her repeated complaints of HAPIs and inadequate patient care. *See* Doc. 28, SAC, ¶¶ 19, 21, 23–25. Her resignation fell on the same day that she reported to Methodist and state regulatory agencies MDMC's "adverse conduct" towards its patients. *Id.* ¶ 25. Therefore, Relator has stated a claim under Texas Health and Safety Code § 161.134.

## V.

## CONCLUSION

For the foregoing reasons, the Court concludes that the SAC's FCA and TMFPA claims fail to meet the pleading standards set forth by Federal Rules of Civil Procedure 12(b)(6) and 9(b). A district court has discretion whether to dismiss a claim with or without prejudice, *see Club Retro L.L.C. v. Hilton, 568 F.3d 181,* 215 n.34 (5th Cir. 2009), and the court may deny an opportunity to replead if an amendment of a claim would be futile. *See Legate v. Livingston*, 822 F.3d 207, 211 (5th Cir. 2016). After considering the allegations, arguments, and underlying HACRP structure, the Court concludes amendment would be futile as to Relator's fraud claims. Relator has also now had two opportunities to amend her original complaint and ample time to investigate the violations alleged. *Simmons v. Sabine River Auth. Louisiana*, 732 F.3d 469, 478 (5th Cir. 2013). Accordingly, Methodist's Motion is **GRANTED** as to Counts One, Two, Three, and Four, which are **DISMISSED** with prejudice. The Court finds Relator has stated plausible claims of retaliation. Therefore, Methodist's Motion is **DENIED** as to Counts Five and Six. Methodist is ordered to file an answer to the SAC within 21 days of the date of this opinion.

SO ORDERED.

SIGNED: March 6, 2024.

JANE J. BOYLE
UNITED STATES DISTRICT JUDGE